assumed confidentiality.  The fact that Radford and Van Dyke did not use magic words like "I can testify in court about what you tell me" as opposed to simply implying "I can tell the police about what you tell me" should not be decisive.  In addition, however, I see no explicit statement in the court's opinion that even the use of such a magic formula would be good enough.

Furthermore, the court misconstrues the government's position in its discussion, at page 15, of "constructive waiver."  The United States does not argue that Hayes *constructively* waived his privilege, which would occur had he repeated the threats to a third party.  Rather it argues, correctly in my view, that Hayes waived any privilege purely and simply, by continuing to threaten after he had been given notice that his threats would not be held in confidence.

All of the court's concerns in support of encouraging persons to confide in mental health professionals would be satisfied by a more limited rule that such recipients of information could not testify about anything said up to the point at which notice is given that the actual or threatened criminal conduct being discussed is no longer covered by confidentiality.  Otherwise, we have the odd spectacle that a criminal can perpetrate his crimes (the threats) simply by either purchasing, or being provided at public expense, a particular type of listener, with no opportunity for the listener to avoid facilitating the crime.

If the real problem is that we don't think that this type of threat, alone, is a very serious matter, then that is for Congress.  I object to creating a barrier that prevents competent testimony as to the commission of a crime by a fully warned patient from coming into court, and I therefore **DISSENT**.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0320P (6th Cir.)
File Name:  00a0320p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

          *v.*                              No. 98-6623

ROY LEE HAYES,
          *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 98-00012—Thomas G. Hull, District Judge.

Argued:  April 26, 2000

Decided and Filed:  September 14, 2000

Before:  RYAN and BOGGS, Circuit Judges; DUGGAN,
District Judge.*

_____

## COUNSEL

**ARGUED:**   Sarah R. Shults, ASSISTANT UNITED STATES ATTORNEY, Greeneville, Tennessee, for Appellant. John T. Milburn Rogers, ROGERS, LAUGHLIN,

---

* The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan , sitting by designation.

NUNNALLY, HOOD & CRUM, Greeneville, Tennessee, for Appellee.  **ON BRIEF:**  Sarah R. Shults, ASSISTANT UNITED STATES ATTORNEY, Greeneville, Tennessee, for Appellant.  John T. Milburn Rogers, J. Gregory Bowman, ROGERS, LAUGHLIN, NUNNALLY, HOOD & CRUM, Greeneville, Tennessee, for Appellee.

RYAN, J., delivered the opinion of the court, in which DUGGAN, D. J., joined.  BOGGS, J. (pp. 18-20), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

RYAN, Circuit Judge.  In this appeal, we are required to decide whether there is a "dangerous patient" exception to the federal psychotherapist/patient testimonial privilege under Fed. R. Evid. 501.  We hold there is not.

The United States seeks to prosecute the defendant Roy Lee Hayes under 18 U.S.C. § 115 for making threats, during several psychotherapy sessions, to murder his supervisor at the United States Postal Service.  Shortly after being indicted, Hayes filed a motion to suppress medical records prepared by his psychotherapists, and to exclude his therapist's expected testimony, on the ground that the medical records and testimony were privileged.  The district court granted Hayes's motion to suppress and, soon thereafter, dismissed the indictment.  We will affirm.

**I.**

Aside from a period of military service, Hayes has worked for the United States Postal Service his entire adult life.  In July 1996, Veda Odle assumed the position of postmaster in Marion, Virginia, and, consequently, interacted regularly with Hayes, who was the union steward for that post office branch.

opening for further consideration in light of other circumstances.

In my opinion, the court's view of this case may be somewhat muddled by the fact that the "crime" at issue here is what some would consider the purely victimless one of making a threat that is not made to the subject of the threat.  It is true that, on one view, simply making a threat that is not intended to be conveyed to the potential victim is not a traditional *malum in se* crime.  However, it is important to recognize that, if the proffered evidence is believed, what occurred here was a crime, no different in nature than making similar threats against Odle to fellow drinkers at a bar, or to a policeman in casual conversation, or to one's lawyer.  In addition, the court's rule would apparently be the same even if the victim of the threat ended up dead, in a fashion exactly paralleling the material revealed to the mental health professional, after a warning of non-confidentiality.  I simply do not see that such tender concern for criminal evidence is required by the common law, or by reason and experience, when the patient has been put on notice.

The record evidence as to the notice Hayes was provided goes somewhat beyond the court's recitation at pages 14-15.  Dr. Radford told Hayes in February, as Hayes himself testified, that his threats to kill Odle would have to be reported.  Van Dyke warned Hayes twice that his threats would not and could not be kept in confidence.  Specifically, on March 10 Van Dyke told Hayes, according to his testimony at the October 27, 1998 evidentiary hearing: "I cannot keep that [homicidal ideation against Odle] within the confines of the room, nor can I keep child abuse within the confines."  He further testified that on March 31 he "reiterated" that same warning to Hayes.  Nevertheless, on that latter occasion, having been warned three times, Hayes went on, in the face of the warning, to detail exactly how he planned to waylay and kill Odle.

This constituted more than ample notice that such discussion was outside the bounds of any promised or

---

### DISSENT

---

BOGGS, Circuit Judge, dissenting.  The court's opinion quite properly distinguishes, in Section III, *supra* at 9-11, the questions of whether a mental health professional (apparently including, in this case, a social worker) can inform the intended victim of a threat, from the question of whether that person can testify in court.  I agree with the court's analysis of the former question.  With respect to the latter question, I believe that when the social worker has specifically informed the patient that the social worker will not keep the communications confidential, there is no barrier to that person testifying, and I therefore respectfully dissent from the court's holding to the contrary.

The governing law in this case is Federal Rule of Evidence 501, which simply says that all privileges are "governed by the principles of the common law . . . in the light of reason and experience."  The Supreme Court has interpreted this concept with respect to the privilege at issue here in *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996), stating that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from *compelled* disclosure under Rule 501 of the Federal Rules of Evidence" (emphasis added).  First, of course, this bare holding does *not* cover the situation here where the social worker is willing to testify.  Second, the details of the social worker, Van Dyke's, psychotherapeutic credentials are perhaps questionable.[1]  Third, the much discussed footnote 19 in *Jaffee* at least indicated that the Supreme Court did not mean that the rule  it had laid down was absolute, with no

---

[1] Van Dyke's position was that of Readjustment Counseling Specialist.  He had a Master's in Education, with a concentration in counseling; he was not yet licensed.  Although the United States has not argued that it is relevant, I note that *Jaffee*'s holding applied to a "*licensed* social worker*" (emphasis added).  *See* 518 U.S. at 15.

Beginning in 1997, Hayes began to behave erratically at work, at times becoming inconsolably depressed and unable to function.  On February 9, 1998, after several episodes of irregular behavior, Hayes sought professional help at the Veterans Administration Mountain Home Hospital (MHH), Johnson City, Tennessee.  The admitting diagnosis for Hayes was major depression accompanied by severe psychotic features.  During treatment, Hayes informed Dr. Dianne Hansen of a desire to kill Odle, a desire Hayes claimed he could resist only because he "recognized" that such action could jeopardize his continued employment.  Dr. Hansen released Hayes on February 18, instructing him to contact a local health care provider and to return to work on February 23.  Although records at MHH indicate plans to warn Odle of the potential threat Hayes posed, it is undisputed that Odle never received any warning from the staff at MHH.

On February 22, Hayes returned to MHH, admitting himself as an in-patient for several days.  During this stay, Hayes reiterated his homicidal inclinations, but MHH doctors concluded that he was capable of controlling himself and understanding the consequences of his actions. Consequently, on February 26, MHH again released Hayes with a prescription for various psychotropic drugs.

On March 10, 1998, Hayes went to the Veterans Center in Johnson City, Tennessee, to discuss his problems with social worker James Edward Van Dyke.  Van Dyke claims to have advised Hayes that he, Van Dyke, had a duty to warn affected third parties should he determine that Hayes posed a serious threat to himself or others.  Although Hayes revealed to Van Dyke that he planned to murder Odle and described in some detail how he would do so, Van Dyke concluded that Hayes was not a serious threat to Odle and allowed him to leave after Hayes agreed to return for additional therapy on March 31.

On March 24, 1998, because Hayes was experiencing certain undesirable side effects from the drugs he was taking, Dr. Hansen discontinued Hayes's prescriptions.   Soon

thereafter, apparently due to the termination of his prescriptions, the death of his uncle, and sleep deprivation prior to undergoing an EEG on March 31, Hayes began to experience increased anxiety and some unraveling of his previous self restraint.

On the evening of March 31, Hayes attended a session with Van Dyke at the Veterans Center. At that time, Hayes outlined in great detail his plan to kill Odle, describing the layout of Odle's home and explaining that he knew when she would be home alone. According to Van Dyke, during this visit, he again advised Hayes that his serious threats toward Odle could not be kept confidential. When the session concluded, however, Van Dyke allowed Hayes to leave for a therapy appointment at MHH. Van Dyke took no further action that evening.

The next day, Van Dyke spoke with a supervisor about Hayes's statements and the supervisor advised contacting the Veterans Center's legal counsel for advice on how to handle this potentially dangerous situation. Counsel for the Veterans Center informed Van Dyke that he had a legal obligation to warn Odle of the threat that Hayes posed, and a short time later Van Dyke did so.

Upon receipt of Van Dyke's warning, Odle understandably became frightened and immediately contacted Postal Inspector Terrance Vlug, who requested all of Hayes's medical records from Van Dyke. Van Dyke provided the records which disclosed Hayes's repeated homicidal statements. Vlug then filed a criminal complaint on April 3, 1998, charging Hayes with threatening to murder a federal official in violation of 18 U.S.C. § 115.

A grand jury issued a three-count indictment against Hayes, charging that, on three occasions, Hayes's murderous remarks to psychotherapists constituted criminal wrongdoing under 18 U.S.C. § 115(a)(1), which provides, in pertinent part:

> Whoever . . . threatens to assault, kidnap, or murder, a United States official . . . with intent to impede,

It is sufficient to say here that none of Hayes's psychotherapists uttered the "magic words."

Finally, the dissent argues that our opinion is shaped by the view that Hayes's behavior is not or should not be considered criminal. To be clear, we need not and do not express any opinion as to whether Hayes's statements to his psychotherapists are covered by 18 U.S.C. § 115. We merely hold that Hayes's psychotherapists cannot testify in his criminal prosecution for alleged violations of section 115 unless he agrees that they may do so. The difference between that holding and what the dissent believes that this court holds, we think, is very significant.

## VII.

For the foregoing reasons, the district court orders suppressing the testimony of Hayes's psychotherapists and dismissing the indictment against Hayes are **AFFIRMED**.

Dyke may not have been a "licensed social worker" during the period he counseled Hayes. There is, however, no evidence that Hayes was aware that Van Dyke lacked professional qualifications. It would, therefore, be grossly unfair to strip Hayes of the protections of a federal evidentiary privilege simply because his counselor was not what he held himself out to be. If anyone should be penalized for Van Dyke's decision to treat Hayes without a license, it should be Van Dyke or some other member of the staff at the Veterans Center.

Second, the dissent declares that all of Hayes's psychotherapists provided him, in so many words, "more than ample notice" that they would testify against him in a criminal proceeding if he confided an intention to harm himself or a third party. Respectfully, this is not what occurred in this case. What cannot be forgotten, in cases of this sort, is that patients such as Hayes often suffer from serious mental and/or emotional disorders. Consequently, it must be the law that, in order to secure a valid waiver of the protections of the psychotherapist/patient privilege from a patient, a psychotherapist must provide that patient with an explanation of the consequences of that waiver suited to the unique needs of that patient. As discussed at length already, none of Hayes's psychotherapists did anything of the sort.

More fundamentally, the dissent's argument seems to assume that the decision whether to waive the protections of the psychotherapist/patient privilege is entrusted to the psychotherapist. That assumption is incorrect. Rather, it is the patient, alone, who has the authority to waive that evidentiary privilege. *See Jaffee*, 518 U.S. at 15 & n.14.

The dissent is quite correct that we do not endorse any "magic formula" for securing a valid waiver of the psychotherapist/patient privilege. It would be foolish to do so. The "magic words" necessary to acquaint an individual, who may have serious mental or emotional problems, with the psychotherapist/patient privilege and the consequences of waiving that privilege will obviously vary from case to case.

intimidate, or interfere with such official . . . while engaged in the performance of official duties, or with intent to retaliate against such official . . . on account of the performance of official duties, shall be punished[.]

18 U.S.C. § 115(a)(1).

After a judicial determination that Hayes was competent to stand trial and discussion on various preliminary motions, Hayes filed a motion to dismiss the indictment and to suppress his medical records and any testimony from his psychotherapists, asserting the psychotherapist/patient privilege.

A magistrate judge recommended dismissing the first two counts of the indictment because those alleged threats had never been disclosed to Odle by doctors at MHH. The magistrate judge concluded, however, that the "threat" revealed to Odle by Van Dyke was not privileged because that revelation was the "only means" of averting harm to Odle. Thus, the magistrate judge recommended denying Hayes's motion as it pertained to the third count of the indictment.

The district court accepted this recommendation and, going even further, ordered suppression of any testimony by Van Dyke. Citing *United States v. Glass*, 133 F.3d 1356 (10th Cir. 1998), the district court held that a psychotherapist may testify as to otherwise privileged statements of threats allegedly made by a patient only where such "disclosure was the only means of averting harm to the [federal official] when the disclosure was made." *Id.* at 1360. The district court held that any communications made to psychotherapists at MHH remained privileged because those doctors had never disclosed to third parties the substance of their therapy sessions with Hayes. Based on Van Dyke's admissions that he considered no option other than disclosure to protect Odle and, in fact, disclosed Hayes's statements only because of an order from a supervisor, the district court held that Van Dyke could not testify since his disclosure was not "the only means of averting harm." Accordingly, the court granted Hayes's motion to exclude the testimony of his psychotherapists

whose information formed the basis of the indictment. Soon thereafter, the district court dismissed the case, an order which the government timely appealed.

## II.

The Federal Rules of Evidence leave the establishment of testimonial privileges to the federal courts:

> Except as otherwise . . . provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Fed. R. Evid. 501. Accordingly, we review *de novo* the district court's analysis of the contours of the psychotherapist/patient privilege. *See In re Zuniga*, 714 F.2d 632, 637 (6th Cir. 1983).

A psychotherapist/patient evidentiary privilege has been well-established in the Sixth Circuit for some time. *See id.* at 641. The Supreme Court recently recognized the privilege in *Jaffee*, holding that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996). The Court observed that recognizing as privileged psychotherapist/patient discussions in the course of therapy would likely facilitate "an atmosphere of confidence and trust" conducive to meaningful treatment. *Id.* at 10. The Court also reasoned that a federal psychotherapist/patient privilege would "serv[e] public ends" as "[t]he mental health of [the American citizen] . . . is a public good of transcendent importance." *Id.* at 11. The Court observed that all 50 States and the District of Columbia had "enacted into law some form of psychotherapist privilege." *Id.* at 12. The Court rejected a "balancing component . . . [m]aking the promise of

evidentiary privilege. To support this theory, the government cites *United States v. Bishop*, No. 97-1175, 1998 WL 385898 (6th Cir. July 1, 1998), an unpublished opinion holding that the psychotherapist/patient privilege can be "waived" if the patient discloses the substance of therapy sessions to unrelated third parties. Hayes responds that, given that he was hospitalized for a serious mental disorder and was taking psychotropic medication during the period which forms the basis for this criminal prosecution, the government has not proved that he "voluntarily and intelligently" waived his rights.

We decline to accept the government's "constructive waiver" theory. It is true that at the outset of psychotherapist/patient privilege, a therapist has a professional responsibility to disclose to a patient "the relevant limitations on confidentiality." *See* American Psychological Association, Ethical Principles of Psychologists and Code of Conduct, Standard 5.01 (Dec. 1992). It is also true that this court has held on various occasions that a patient can waive the protections of the psychotherapist/patient privilege by disclosing the substance of therapy sessions to unrelated third parties. *See, e.g.*, *Snelenberger*, 24 F.3d at 802. But, that is not the case here. It is one thing to inform a patient of the "duty to protect"; it is quite another to advise a patient that his "trusted" confidant may one day assist in procuring his conviction and incarceration. None of Hayes's psychotherapists ever informed him of the possibility that they might testify against him and, therefore, Hayes cannot be said to have "knowingly" or "voluntarily" waived his right to assert the psychotherapist/patient privilege here. We conclude, therefore, that the government's constructive waiver argument is meritless.

## VI.

In his dissenting opinion, Judge Boggs essentially presents two purported flaws he perceives in our opinion. First, the dissent suggests that, with regard to Van Dyke, the psychotherapist/patient privilege might not apply because Van

of which approximated what is proposed here. *See* Rules of Evidence for United States Courts and Magistrates, 56 F.R.D. 183, 241 (1972). To conclude, "reason and experience" teach us that a "dangerous patient" exception which would allow a psychotherapist to testify against a patient in criminal proceedings should not become part of the federal common law.

We hold, therefore, that the federal psychotherapist/patient privilege does not impede a psychotherapist's compliance with his professional and ethical duty to protect innocent third parties, a duty which may require, among other things, disclosure to third parties or testimony at an involuntary hospitalization proceeding. Conversely, compliance with the professional duty to protect does not imply a duty to testify against a patient in criminal proceedings or in civil proceedings other than directly related to the patient's involuntary hospitalization, and such testimony is privileged and inadmissible if a patient properly asserts the psychotherapist/patient privilege.

Finally, our holding today and the Supreme Court's discussion of the psychotherapist/patient privilege in *Jaffee* require a revisitation of *Snelenberger*, a case which preceded *Jaffee*. We conclude that, to the extent that this court held that once the Michigan "duty to protect" attached, the federal psychotherapist/patient privilege ceased to apply in any further court proceedings, *Jaffee* requires the conclusion that *Snelenberger* is no longer good law. *See Snelenberger*, 24 F.3d at 802.

## V.

The government's alternative argument is that, even if the "dangerous patient" exception is not applicable in this case, Hayes cannot claim that he "reasonably expected" his threats to remain confidential because his therapists advised him of their "duties to protect." Consequently, it is the government's theory that, when Hayes chose to continue discussions with the therapists after receiving such advice, he constructively waived the protections of the psychotherapist/patient

confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure." *Id.* at 17. The Court wisely declined to identify all situations where the privilege would and would not apply, but observed in a footnote: "[W]e do not doubt that there are situations in which the privilege must give way, *for example*, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist." *Id.* at 18 n.19 (emphasis added).

Among the courts of appeals, only the Tenth Circuit has decided whether there exists a "dangerous patient" exception to the federal psychotherapist/patient privilege. In *Glass*, the defendant told his psychotherapist that he intended to kill the President. *See Glass*, 133 F.3d at 1357. Although, initially, the defendant's threats were not taken seriously, after the defendant could not be located for 10 days, a nurse reported the threat to local law enforcement. *Id.* Eventually, the Secret Service became involved and the defendant's psychotherapist revealed the defendant's threatening statements. *Id.* After the government charged the defendant under 18 U.S.C. § 871, the defendant moved to exclude his psychotherapist's testimony as privileged. The district court denied the motion. *Id.*

On appeal, the Tenth Circuit reversed and held that the alleged "exception" to the *Jaffee* privilege, described in footnote 19, is applicable only where the threat was serious *when made* and disclosure was literally the only means of averting harm. *See id.* at 1359. The court concluded that, given that the psychotherapist had initially released the defendant, his threat could not be classified as serious. *Id.* Moreover, the court ruled, the government failed to show that disclosure was the only means of protecting the President from harm and, therefore, the privilege applied to the psychotherapist's testimony. *Id.*

Before *Jaffee* was handed down, this court decided *United States v. Snelenberger*, 24 F.3d 799 (6th Cir. 1994), in which

Snelenberger, attempting to establish an entitlement to social security benefits, informed his psychotherapist that he intended to kill an administrative law judge who had ruled against him on a previous claim to benefits. *Id.* at 801. After hearing this and other similarly disturbing statements, the psychotherapist decided that involuntary hospitalization was appropriate and directed Snelenberger to the hospital staff for transportation to an institution. *Id.* While in the custody of the hospital staff, Snelenberger repeated several times his plan to kill the ALJ. *Id.* Eventually, Snelenberger was indicted on three counts of threatening to murder an ALJ, in violation of 18 U.S.C. § 115(a)(1)(B). *Id.* Over Snelenberger's objection, the psychotherapist testified against him at his trial. This court ruled that such testimony was proper because the Michigan legislature had enacted a statute requiring a psychotherapist to take steps to protect those "seriously threatened." *Id.* at 802. In the alternative, this court ruled that Snelenberger had waived the privilege by disclosing his intentions toward the ALJ to various parties after speaking with the psychotherapist. *Id.*

The government argues that the purported exception to the psychotherapist/patient privilege, set forth in the *Jaffee* footnote, applies here and that Van Dyke's testimony is admissible, an argument which relies heavily on *Snelenberger*, and is structured as follows: (1) Tennessee law placed an affirmative obligation on Van Dyke to protect Odle after he learned of the serious threat Hayes posed, Tenn. Code Ann. § 33-10-302(a); (2) Van Dyke complied with this duty; and (3) after Van Dyke made this disclosure, the psychotherapist/patient privilege became inapplicable for all future court proceedings. Moreover, the government contends, once Hayes's statements to Van Dyke ceased to be privileged, Hayes could no longer claim that statements made during therapy sessions with psychotherapists other than Van Dyke were privileged.

The government also argues that the district court should not have relied on the Tenth Circuit's *Glass* opinion, suggesting that there are two serious deficiencies in that

proceedings, such as those for the involuntary commitment of a patient, to comply with their "duty to protect" the patient or identifiable third parties. After involuntary hospitalization, for example, the patient would no longer pose a "serious threat of harm" to anyone and, hopefully, the psychotherapist/patient relationship can continue during the patient's hospitalization. While that patient, by definition, will initially reject the prospect of hospitalization, it may ultimately improve his mental state and should not leave a stigma after the stay concludes. In such a case, therefore, both "public ends" will likely be served.

On the other hand, a psychotherapist's testimony used to prosecute and incarcerate a patient who came to him or her for professional help cannot be similarly justified. Once in prison, even partly as a consequence of the testimony of a therapist to whom the patient came for help, the probability of the patient's mental health improving diminishes significantly and a stigma certainly attaches after the patient's sentence is served. While, as with involuntary hospitalization, incarceration would serve the "public end" of neutralizing the threat posed by a patient, the price paid in achieving that neutralization may often be that many patients will not seek the professional help they need to regain their mental and emotional health. Thus, we conclude that the proposed "dangerous patient" exception is unnecessary to allow a psychotherapist to comply with his or her professional responsibilities and would seriously disserve the "public end" of improving the mental health of our Nation's citizens.

Third, we are persuaded that adoption of a "dangerous patient" exception as part of the federal common law is ill-advised. The majority of states have no such exception as part of their evidence jurisprudence; California, alone, has enacted a "dangerous patient" exception as part of its evidence code which would arguably apply in a criminal case. WEST'S Ann. CAL. EVID. CODE § 1024. We note, too, that the Proposed Rules of Evidence on the subject of privileges submitted by the Supreme Court in 1972 recognized a psychotherapist/patient privilege with three exceptions, none

the purpose of federal evidence law of which the Supreme Court spoke in *Jaffee*. *See Jaffee*, 518 U.S. at 10-13.

First, recognition of a "dangerous patient" exception surely would have a deleterious effect on the "atmosphere of confidence and trust" in the psychotherapist/patient relationship. While early advice to the patient that, in the event of the disclosure of a serious threat of harm to an identifiable victim, the therapist will have a duty to protect the intended victim, may have a marginal effect on a patient's candor in therapy sessions, an additional warning that the patient's statements may be used against him in a subsequent criminal prosecution would certainly chill and very likely terminate open dialogue. *See*, *e.g.*, Gregory B. Leong, *et al.*, *The Psychotherapist as Witness for the Prosecution: The Criminalization of Tarasoff*, AM. J. PSYCHIATRY 149:8, at 1011, 1014 (Aug. 1992). Thus, if our Nation's mental health is indeed as valuable as the Supreme Court has indicated, and we think it is, the chilling effect that would result from the recognition of a "dangerous patient" exception and its logical consequences is the first reason to reject it.

Second, we think that allowing a psychotherapist to testify against his or her patient in a criminal prosecution about statements made to the therapist by the patient for the purposes of treatment arguably "serv[es] [a] public end," but it is an end that does not justify the means. The *Jaffee* footnote recognizes that in cases such as this, there are at least two interests at stake: the improvement of our citizens' mental health achieved, in part, by open dialogue in psychotherapy, on the one hand, and the protection of innocent third parties, on the other. Both are "public ends" which the federal common law should foster. We believe, therefore, that the *Jaffee* footnote is no more than an aside by Justice Stevens to the effect that the federal psychotherapist/patient privilege will not operate to impede a psychotherapist's compliance with the professional duty to protect identifiable third parties from serious threats of harm. We think the *Jaffee* footnote was referring to the fact that psychotherapists will sometimes need to testify in court

court's reasoning. The government maintains, first, that it was erroneous for the *Glass* court to conclude that a psychotherapist could not take into account developments subsequent to the making of a threat in deciding whether to disclose a patient's threatening remarks and, second, that limiting the "dangerous patient" exception to situations where disclosure is the "only" means of averting harm sets an impossibly high standard.

Hayes responds that the Tenth Circuit's version of the "dangerous patient" exception is sound and should be adopted by this court. It is Hayes's position that Van Dyke failed to consider feasible alternatives short of disclosure to protect Odle and, hence, did not act as a reasonable mental health professional. According to Hayes, the Tennessee statutory duty to protect identifiable third parties did not attach and, therefore, the federal testimonial privilege is still effective. Hayes also argues that psychotherapists at MHH never took any steps to protect Odle and, consequently, the confidentiality of Hayes's relationship with the employees at MHH has never been in doubt.

### III.

Before turning to the question whether it is advisable to graft a "dangerous patient" exception for criminal proceedings onto the federal psychotherapist/patient privilege, we will first clarify a misperception held by Hayes, the government, and, to some extent, the Tenth Circuit that the standard of care exercised by a treating psychotherapist prior to complying with (or, for that matter, failing to comply with) a state's "duty to protect" requirement is somehow pertinent to the applicability of the psychotherapist/patient privilege in criminal proceedings. We think there is little correlation between those two inquiries.

The "duty to protect" now imposed on psychotherapists throughout the country began with *Tarasoff v. Regents of the University of California*, 551 P.2d 334 (Cal. 1976). In that case, the California Supreme Court held that "once a therapist does in fact determine, or under applicable professional

standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger." *Id.* at 345. The obvious rationale behind this rule is that the preservation and protection of the health and safety of innocent third parties outweighs the good achieved by maintaining the confidentiality of life-threatening communications. After that decision, Tennessee, like most other states, codified the psychotherapist's "duty to protect" third parties from serious threats. *See*, *e.g.*, Tenn. Code Ann. § 33-10-302.

We see only a marginal connection, if any at all, between a psychotherapist's action in notifying a third party (for his own safety) of a patient's threat to kill or injure him and a court's refusal to permit the therapist to testify about such threat (in the interest of protecting the psychotherapist/patient relationship) in a later prosecution of the patient for making it. State law requirements that psychotherapists take action to prevent serious and credible threats from being carried out serve a far more immediate function than the proposed "dangerous patient" exception. Unlike the situation presented in *Tarasoff*, the threat articulated by a defendant such as Hayes is rather unlikely to be carried out once court proceedings have begun against him.

Moreover, we think that conditioning the applicability of the proposed "dangerous patient" exception on the standard of care exercised by a treating psychotherapist is unsound in theory and in practice. Were we to adopt the analytical methodology proposed by Hayes and the government, future cases of this sort will devolve into a battle of experts testifying whether a psychotherapist behaved "reasonably" before disclosing what was believed to be a serious threat. Such an inquiry would, at a minimum, be highly speculative and very likely lead to erratic results. More fundamentally, we think it would be rather perverse and unjust to condition the freedom of individuals on the competency of a treating psychotherapist. Moreover, it cannot be the case that the scope of a federal testimonial privilege should vary depending

upon state determinations of what constitutes "reasonable" professional conduct. Thus, we reject the purported relevance of the degree of care exercised by Van Dyke or the psychotherapists at MHH on the issue of Hayes's right to assert the psychotherapist/patient privilege. Given that the "dangerous patient" exception crafted by the Tenth Circuit in *Glass* is linked to the standard of care exercised by the psychotherapist, we respectfully decline to follow that court's treatment of the privilege.

### IV.

At the threshold, we note the paradoxical nature of this case. On the one hand, Hayes should be applauded for seeking professional help for the mental and emotional difficulties he was suffering. Yet, because the psychotic delusions for which he sought treatment took the form of homicidal intentions toward an employee of the federal government, Hayes now finds himself facing a felony conviction and incarceration because his professional care givers are prepared to testify against him.

The government acknowledges this paradox, but relies upon a footnote in the *Jaffee* opinion to resolve the apparent dilemma. To repeat, footnote 19 states: "[W]e do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist." *Jaffee*, 518 U.S. at 18 n.19. Our task is to decide whether this *dictum* establishes a precedentially binding "dangerous patient" exception to the federal psychotherapist/patient testimonial privilege applicable in criminal proceedings under Fed. R. Evid. 501.

Passing for the moment the question whether the Supreme Court adopted a "dangerous patient" exception to the psychotherapist/patient privilege in a footnote, we begin by examining the effect such an exception would have on the "confidence and trust" that is implicit in the confidential relationship between therapist and patient, and particularly, whether such an exception would "serv[e] public ends" and