IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 11, 2008

Charles R. Fulbruge III
Clerk

No. 07-30084

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

JOHN C. AUSTER,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, DAVIS, and SMITH, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Knowing that his therapist, Dr. Fred Davis, would convey his threat to its target, John Auster informed Davis that unless the managers of his workers' compensation claim continued to pay the benefits that he believed he was owed, he would "carry out his plan of violent retribution" against them and others. The authorities were called, Auster arrested and indicted for extortion. Though denying his motion to dismiss the indictment, the district court ruled that communications between Auster and his therapist were inadmissible at trial under

the psychotherapist-patient privilege. The government appeals that interim order, and we reverse and remand, because Auster had no reasonable expectation of confidentiality when he made his threat.

I.

Auster, a retired New Orleans police officer, has been receiving workers' compensation benefits since 1989. Cannon Cochran Management Services, Inc. ("CCMSI"), manages Auster's benefit claim. Auster is treated for paranoia, anger, and depression and has threatened various individuals over the years. He often makes his threats during sessions with his two therapists, Davis and Dr. Harold Ginzburg, and his therapists then relaySSpursuant to their "duty to warn"[1]SShis threats to their targets. Auster admits that he is aware that his threats are communicated in that way.[2]

Auster's relationship with CCMSI is strained. His anger regarding the administration of workers' compensation settlement is a frequent topic of therapy. In the past, after particularly troubling sessions, Auster's therapists have felt compelled to warn CCMSI employees about his potential for violence.

In September 2006, CCMSI informed Auster that it would stop paying a portion of his benefits beginning on October 1, 2006. On September 13, Auster discussed the pending partial termination of benefits with Davis, specifically

---

[1] See, e.g., Hutchinson v. Patel, 637 So. 2d 415, 424 (La. 1994) (citing LA. REV. STAT. ANN. 9:2800.2).

[2] In argument to the district court, Auster's lawyer conceded that Auster "was in fact on occasion told that his threats of violence would be communicated to CCMSI." Likewise, when Ginzburg related to Auster, after Auster had threatened CCMSI on a separate occasion, that CCMSI had been warned, Auster stated that "he had expected that [Ginzburg] would do just that." Auster introduced into evidence a letter from Davis to CCMSI wherein Davis stated that "I have had to exercise my duty to warn, with [Auster's] knowledge, several times when he was in danger of acting violently . . . . Mr. Auster is well aware of my position regarding violence and has agreed that he understands that I have such an obligation. This understanding has not interfered in his reporting of homicidal intentions in the past."

threatening CCMSI personnel, city authorities, and police officials. Davis sent Keith Smith, a CCMSI employee responsible for Auster's claim, a letter warning that it was Auster's position that if "CCMIS [sic] persists in their position," that would "serve as a provocation for him to carry out his plan of violent retribution against a list of persons he feels have caused him injury." Davis alerted CCMSI that Auster had stated that he possessed "stockpiles of weapons and supplies to provide the basis for his actions." October 2 was marked as the date of "violent retribution."

When Smith received Davis's letter, he became concerned, bought a gun for self-defense, and called the police, who notified the FBI; Auster was arrested on September 29. The United States filed an extortion complaint against Auster under 18 U.S.C. § 1951,[3] alleging that he made his threat with knowledge and intent that Davis would convey it to CCMSI, thereby causing CCMSI to submit to his demands. The magistrate judge and district court, respectively, held detention hearings and took evidence.

Auster unsuccessfully moved to dismiss the complaint; a grand jury indicted him for "attempt[ing] to obtain property of CCMSI with the consent of CCMSI having been induced by the wrongful use of threatened force, violence and fear, in that the defendant did communicate to CCMSI, via his treating psy-

---

[3] Title 18 U.S.C. § 1951 states that

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

. . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

chotherapist," his threat of violence if his benefits were reduced.

Before the indictment issued, Auster unsuccessfully argued to the magistrate judge that the communications between him and Davis were privileged. After a hearing, the court suppressed the communications, citing the psychotherapist-patient privilege.

## II.

### A.

"'Except as otherwise required by the Constitution of the United States' or other authority listed in Rule 501, . . . privilege[s] 'shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.'" United States v. Robinson, 121 F.3d 971, 974 (5th Cir. 1997) (quoting FED. R. EVID. 501). We review factual findings underlying a privilege ruling for clear error and the application of legal principles de novo. Id.

### B.

"For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence." United States v. Bryan, 339 U.S. 323, 331 (1950) (internal citations and quotations omitted). This "fundamental principle," Trammel v. United States, 445 U.S. 40, 50 (1980), counsels that privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." United States v. Nixon, 418 U.S. 683, 710 (1974).

The psychotherapist-patient privilege is a recognized privilege.[4] Though

---

[4] "In every state, the therapist-patient relationship is given some level of protection in court cases; but all such privilege laws contain exceptions that allow a psychologist's records or testimony to be admitted as evidence in certain circumstances." Mary Alice Fisher, Protect-

(continued...)

declining to "delineate [the privilege's] full contours" in a way that would "govern all conceivable future questions in this area," Jaffee v. Redmond, 518 U.S. 1, 18 (1996), the Court recognized that this privilege can be appropriate in certain circumstances.[5] The Court, however, mindful of the burden imposed on the judiciary's truth-seeking function, unambiguously limited the psychotherapist-patient privilege's applicability to those instances in which the patient's statement was made in confidence, holding that the "privilege covers confidential communications made to licensed psychiatrists and psychologists[, and] confidential communications made to licensed social workers in the course of psychotherapy." Id. at 15 (emphasis added).

Jaffee's explicit confidentiality requirement is fatal to Auster's claim of privilege. Because Auster knew, when he made the September 13 threat, that it would be forwarded to CCMSI, his privilege claim fails, because he had no reasonable basis to conclude that the statement was confidential. As a matter of law, where the confidentiality requirement has not been satisfied, the psycho-

---

[4] (...continued)
ing Confidentiality Rights: the Need for an Ethical Model, AM. PSYCHOLOGIST, Jan. 2008, at 10.

[5] The Court added that

[a]lthough it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist.

Jaffee, 518 U.S. at 18 n.19. Although we decline to rule on whether there is a dangerous-patient exception to the psychotherapist-patient privilege, we note that the foregoing footnote demonstrates that the Court viewed the privilege as limited in scope. Moreover, because the Court contemplated that the privilege must give way in some instances involving dangerous patients, even where there is confidentiality, it follows a fortiori that the privilege is inapplicable in similar situations involving dangerous patients where there is no confidentiality.

therapist-patient privilegeSSas with other privileges[6]SSdoes not apply.

Auster was informed repeatedly by his therapists that his violent threats, although made during therapy, would be communicated to his potential victims.[7] That is unremarkable; his therapists have a Tarasoff duty[8] to convey "significant" "threat[s] of physical violence" against "clearly identified . . . victims,"[9] and they also have an ethical duty to inform Auster of that legal duty.[10] Consequent-

---

[6] See, e.g., 1 CHARLES MCCORMICK, MCCORMICK ON EVIDENCE § 72 (Kenneth S. Broun ed., 6th ed. 2006) (requiring for all privileges that "[t]he communications must originate in a confidence that they will not be disclosed . . . .") (quoting 8 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2285 (John T. McNaughton ed., rev. ed. 1961)). For a helpful discussion of the privilege as recognized in federal court under rule 501 and as recognized in Jaffee, see generally 2 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 501.02[6] (LexisNexis 9th ed. 2006).

[7] The district court found that "[t]he communication to his ongoing, treating psychotherapist was confidential and concerned the subject matter of Auster's treatment." That factual finding of confidentiality is clearly erroneous. As noted, see supra note 2, Auster's lawyer conceded that Auster "was in fact on occasion told that his threats of violence would be communicated to CCMSI." Davis and Ginzburg also have informed Auster that they have a legal duty to convey his threats to those at risk, and, in a letter Auster introduced into evidence, Davis stated unequivocally that "Mr. Auster is well aware of my position regarding violence and has agreed that he understands that I have such an obligation."

[8] Tarasoff v. Regents of the Univ. of Cal., 551 P.2d 334 (Cal. 1976) (recognizing duty of mental health therapists to warn third parties of potential violence in certain circumstances). Tarasoff, a nationally recognized authority, triggered what has been described as "ethical-legal confusion" for mental health practitioners. Fisher, supra note 4, at 4.

[9] Under Louisiana law, "[w]hen a patient has communicated a threat of physical violence, which is deemed to be significant in the clinical judgment of the treating psychologist or psychiatrist . . . against a clearly identified victim or victims, coupled with the apparent intent and ability to carry out such threat, the psychologist . . . or the psychiatrist . . . treating such patient and exercising reasonable professional judgment, shall not be liable for a breach of confidentiality for warning of such threat or taking precautions to provide protection from the patient's violent behavior." LA. REV. STAT. ANN. 9:2800.2. This has been construed as a "duty to warn." Hutchinson, 637 So. 2d at 424.

[10] See, e.g., Jaffee, 518 U.S. at 13 n.12 ("At the outset of their relationship, the ethical therapist must disclose to the patient the relevant limits on confidentiality.") (internal citations and quotations omitted).

ly, when Auster made the threat, he knew it would be relayed to CCMSI.[11]  He therefore had no "reasonable expectation of confidentiality," Robinson, 121 F.3d at 976, in his threatening statement, and without such a reasonable expectation, there is no privilege.

## C.

The federal circuits are in disagreement in this regard.  The Sixth and Ninth Circuits have held that such statements, though made without a reasonable expectation of confidentiality, are nonetheless privileged,[12] and the Tenth Circuit has held that, in such situations, the psychotherapist-patient privilege must give way, though for reasons different from those we have articulated.[13] We respectfully disagree with those circuits that have extended Jaffee by holding that even if a patient knows that a threat is not made in confidence, any statements made to the therapist are privileged in a federal trial.  Those courts have held, thus, that confidentiality is not a requirement for the applicability of the psychotherapist-patient privilege, the Ninth Circuit's holding being explicit in

---

[11] Auster argues that the letter Davis sent was not a Tarasoff letter, given that on September 20, 2006, Davis sent CCMSI another letter indicating that if Auster persisted in his threats, Davis would send a Tarasoff letter.  Auster does not explain how Davis legally and ethically could have sent the September 13 letter to CCMSI, detailing Auster's therapy, unless that letter fell under the Tarasoff exception to the confidentiality obligation.  The district court, likewise, ruled that "Dr. Davis complied with the duty to protect by informing CCMSI of potential threats," a factual finding that we see no reason to question.  But whether it was a Tarasoff letter, in Davis's clinical opinion, is ultimately beside the point:  The controlling question is whether Auster had a "reasonable expectation of confidentiality," Robinson, 121 F.3d at 976, when he made the threat.  Because he knew he was making a threat of physical violence against specific victims to commence on a specific date, he also knew that his statement was of the sort that Davis had a duty to disclose.  Under these circumstances, any expectation of confidentiality would have been "manifestly unreasonable."  Id.

[12] See United States v. Chase, 340 F.3d 978 (9th Cir. 2003) (en banc); United States v. Hayes, 227 F.3d 578 (6th Cir. 2000).

[13] See United States v. Glass, 133 F.3d 1356 (10th Cir. 1998) (recognizing a dangerous-patient exception to the psychotherapist-patient privilege).

that regard.[14] That viewSSwhich is not in accord with Jaffee or testimonial privileges generally[15]SSis open to question.

In support for their position, the Sixth and Ninth Circuits assert that "[i]f the federal evidentiary privilege were tied to the states' disclosure laws, then similarly situated patients would face different rules of evidence in federal criminal trials," Chase, 340 F.3d at 987, and "it cannot be the case that the scope of a federal testimonial privilege should vary depending upon state determinations of what constitutes 'reasonable' professional conduct," Hayes, 227 F.3d at 584. But this misunderstands the effect of state law. Federal law does not depend on state law but instead is turning on the lack of confidentiality, regardless of the reason. Though, in certain instances, state law may play a role in negating confidentiality (just as other factors can nullify it, e.g., the presence of third parties[16]), the operative test is a federal one: whether there was a "reasonable expectation of confidentiality" when the statement was made.

Likewise, both the Sixth and Ninth Circuits erroneously conclude that in weighing the pros and cons of extending the psychotherapist-patient privilege, the harm in permitting material obtained from a therapy session into a criminal trial outweighs its benefits. This is a miscalculation. It is true that in Jaffee, 518 U.S. at 10, the Court noted that the "private ends" served by a psychotherapist-patient privilege include "an atmosphere of confidence and trust," something that is necessary for effective therapy. And, at the same time, the Court ob-

---

[14] See Chase, 340 F.3d at 985-87.

[15] See Hayes, 227 F.3d at 589 (Boggs, J., dissenting) ("Hayes waived any privilege purely and simply . . . by continuing to threaten after he had been given notice that his threats would not be held in confidence.").

[16] See, e.g., United States v. Pipkins, 528 F.2d 559, 563 (5th Cir. 1976) ("It is vital to a claim of privilege that the communication have [sic] been made and maintained in confidence. Thus courts have refused to apply the privilege to information that the client intends his attorney to impart to others, or to communications made in the presence of third parties.") (internal citations omitted).

served that the privilege can be relatively costless, because "[w]ithout a privilege, much of the desirable evidence to which litigants . . . seek access . . . is unlikely to come into being." Id. at 12. These considerations led the Court to conclude that the psychotherapist-patient privilege, at least in some form, should be recognized.

But, as the Jaffee Court implicitly recognized by explicitly requiring confidentiality,[17] this cost-benefit calculation is inapt where the patient already knows the confidence will not be kept. Consider the marginal impact on effective therapy of allowing a statement into evidence that the patient knew would be communicated to third parties when he uttered it.[18] In such a case, the "atmosphere of confidence and trust" has already been severely undermined.[19] Now, the patient's target and deepest enemy, "the person the deranged individual hates so much that he plans to kill him," Chase, 340 F.3d at 997 (Kleinfeld, J., concurring), knows the patient's secret. And for sincere threats, the target can

---

[17] In fact, after "hold[ing] that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure," Jaffee, 518 U.S. at 15, the Court added a footnote that underscores the appropriateness of a per se rule requiring confidentiality before the privilege is applicable: "Like other testimonial privileges, the patient may of course waive the protection," id. at 15 n.14. By both expressly noting the possibility of waiver and tying the psychotherapist-patient privilege to other testimonial privileges (which all require that the statements be made in confidence), the Court reiterated the fundamental nature of confidentiality.

[18] Cf. Case Comment, Sixth Circuit Holds That Tarasoff Disclosures Do Not Vitiate Psychotherapist-Patient Privilege, 114 HARV. L. REV. 2194, 2199 (2001) ("The critical question is thus whether a significant number of patients who disclose their violent impulses to their psychotherapists even after learning of the Tarasoff exception would become unwilling to do so when advised that if they actually acted on those impulses, their psychotherapists might have to testify against them. The Hayes majority offered no rationale for its belief that there would be many such patients, and, in fact, psychological literature suggests that few patients would react in this way. Those patients who remain in therapy even after being advised of the limits on confidentiality typically do so because they recognize their need for help and believe that psychotherapy may provide it.") (internal citations omitted).

[19] The Sixth and Ninth Circuits concedeSSas they mustSS that these warnings have at least some marginal effect on a patient's willingness to speak openly with his therapist. See Hayes, 227 F.3d at 584-85; Chase, 340 F.3d at 990.

now defend himself. If the therapist's professional duty to thwart the patient's plans has not already chilled the patient's willingness to speak candidly, it is doubtful that the possibility that the therapist might also testify in federal court will do so.[20]

The deleterious effect of a Tarasoff warning on the "atmosphere of confidence and trust" is further reinforced by the knowledge that the intimate details of therapy will be spread to more than just the target of the threat.[21] There is, after all, no obligation that the target keep the Tarasoff warning confidential, and it is unrealistic to believe that he will do so; there are likely mutual acquaintances between the target and the patientSSe.g., friends, co-workers, familySS and the target will almost certainly tell them, if for no other reason than to let them know that there is a potentially serious problem with the patient and that everyone ought to be on the lookout for trouble.

Thus, knowing that anyone, or everyone, might be privy to the secret will embarrass the patient and will detrimentally affect his relationships with others. Such a Tarasoff disclosure might also cost the patient his job. The marginal increase, therefore, in effective therapy achieved by privileging psychotherapist-patient communications at trial, but still allowing the therapist to warn threatened third parties, is de minimis.

Moreover, it is not even true, under the Sixth and Ninth Circuits' standard, that a therapist cannot assist in having a patient locked away. Both courts acknowledge that a psychotherapist can testify in civil commitment hearings. See id. at 991; Hayes, 227 F.3d at 585. Though there is a legal distinction be-

---

[20] All are "concerned about deranged murderous individuals stopping valuable therapy because" they do not trust their therapists, but if that were to happen, "it doubtless already [will] have occurred [when the patient learns that] the psychotherapist [will] betray[] their confidences to their worst enemies." Chase, 340 F.3d at 997 (Kleinfeld, J., concurring).

[21] "[O]nce information is released, both client and psychologist lose control over redisclosure." Fisher, supra note 4, at 10.

tween criminal incarceration and involuntary civil commitment, the nuanceSSin terms of trust and confidenceSSlikely does not matter much to the fellow committed.[22] Because, "by definition," patients "reject the prospect of [forced] hospitalization," Hayes, 227 F.3d at 585, "reason and experience" dictate that it is unlikely that many patients will be dissuaded from seeking therapy by the additional chance that, aside from being committed against their will because of what they say to their therapists, they may also be criminally incarcerated based in part on those same statements.

The slight marginal therapeutic benefit of allowing the therapist to divulge confidences and to testify in civil commitment hearings, but not in federal criminal trials, must then be weighed against the marginal increase in "having truth vindicated and justice done." Chase, 340 F.3d at 997 (Kleinfeld, J., concurring). The public interest at stake in a criminal trial of any sort is substantial, more so than in a civil case like Jaffee. But the criminal issues that are raised by cases like Auster's are of a more serious sort still, because the Tarasoff duty does not come into play lightly. Those cases are the ones that are the most serious, so any marginal increase in the admissibility of probative evidence in criminal proceedings is especially valuable.[23] Consequently, where a patient has no reasonable expectation of confidentiality, the cost-benefit scales favor disclosure.[24]

---

[22] Cf. O'Connor v. Donaldson, 422 U.S. 563, 575 (1975) ("A finding of 'mental illness' alone cannot justify a State's locking a person up against his will . . . .") (emphasis added).

[23] Moreover, "[i]n the event that a patient actually carried out or attempted to carry out threats that his psychotherapist had already disclosed, the psychotherapist's testimony could be critically important in establishing such elements as identity, motive, and absence of mistake." Case Comment, supra note 18, at 2199.

[24] The Ninth Circuit posits that the lack of confidentiality is not dispositive, because it is a legal "fiction that the patient knows that a disclosure for one purpose (warning a potential target of violence) is a disclosure for all purposes (including incriminating testimony in a federal criminal trial)," and, if "a patient actually does know the law[, then] . . . the legal rule itself, whatever it may be, will govern the patient's expectations." Chase, 340 F.3d at 988-89. (continued...)

The Sixth and Ninth Circuits also opine that because the majority of states permit psychotherapists to issue Tarasoff or other similar warnings but not to testify at trial, the federal courts should not let them testify either.[25] This justification too is wanting. There is not a uniform consensus among the states regarding statements made with no reasonable expectation of confidentiality.[26]

Even a cursory review of the laws of the states reveals wide divergences. For instance, in California "a psychotherapist not only must disclose to authorities or intended victims the existence of a dangerous patient, [he] also may testify to threats made during the course of therapy." Chase, 340 F.3d at 986 (citing CAL. EVID. CODE § 1024). A decision from an appellate court suggests that Florida follows California.[27] States like West Virginia, Connecticut, and Wyoming also seem to favor the testimony's admission.[28] North Carolina's code

---

[24] (...continued)
Even if we were to accept that Jaffee permits us to interpret "confidential" to mean merely confidential-at-law and not (the more intuitive) confidential-in-fact, the above discussion demonstrates that we should not. As explained, the slight marginal benefit on effective therapy achieved by recognizing the privilege's applicability where a patient knows a threat will be conveyed is substantially outweighed by the marginal costs. The Ninth Circuit's position is thus a doctrinal cul-de-sac, interesting but leading nowhere.

[25] See, e.g., id. at 986 ("Almost all states . . . recognize the distinction between confidentiality (which is affected by the Tarasoff duty) and testimonial privilege (which is not).").

[26] See Jaffee, 518 U.S. at 12 ("[A]ll 50 states and the District of Columbia have enacted into law some form of psychotherapist privilege.").

[27] See Guerrier v. Florida, 811 So. 2d 852, 855 (Fla. App. Ct. 2002) ("[T]he Legislature intended to allow admission of the psychiatrist's testimony in a subsequent prosecution of the dangerous patient for offenses committed against the victim.").

[28] See W. VA. CODE § 27-3-1 ("Confidential information may be disclosed . . . . [p]ursuant to an order of any court based upon a finding that the information is sufficiently relevant to a proceeding before the court to outweigh the importance of maintaining the confidentiality established by this section . . . [in order t]o protect against a clear and substantial danger of imminent injury by a patient or client to himself, herself or another . . . ."); CONN. GEN. STAT. § 52-146c ("[I]n civil and criminal actions . . . all communications shall be privileged and a psychologist shall not disclose any such communications . . . . [unless i]f the psychologist believes in good faith that there is risk of imminent personal injury to the person or to other individuals
(continued...)

contemplates judges' deciding on a case-by-case basis whether to exclude such evidence,[29] and Texas does not recognize the psychotherapist-patient privilege at all in criminal cases.[30]

Moreover, for the reasons laid out above, it would not significantlySSif at allSSundermine state laws to hold that a defendant cannot claim the protections of the psychotherapist-patient privilege if he had actual knowledge, when making the statements, that they would not be kept confidential. It is unlikely that any patient, knowing that his threats will be relayed to the relevant target, will be substantially deterred from seeking therapy by the additional possibility that, although the therapist will not testify in a state criminal trial, the patient may some day be on trial for a federal crime, and his therapist might be called to testify. In summary, because Auster concedes that he had actual knowledge that his threat would be conveyed to CCMSI, his threat was not confidential, and, under Jaffee, the psychotherapist-patient privilege does not apply.[31]

---

[28] (...continued)
or risk of imminent injury to the property of other individuals."); WYO. STAT. ANN. § 33-27-123 ("In judicial proceedings, whether civil, criminal, or juvenile . . . a patient. . . may refuse to disclose or prevent the disclosure of confidential information [except] . . . . [w]here an immediate threat of physical violence against a readily identifiable victim is disclosed to the psychologist . . . .").

[29] See N.C. GEN. STAT. § 8-53.3 ("Any . . . judge in the district in which the action is pending may . . . compel disclosure, either at the trial or prior thereto, if in his or her opinion disclosure is necessary to a proper administration of justice.").

[30] See Tex. R. Evid. 510 (limiting the privilege to civil cases). It is uncertain whether Virginia follows Texas in this regard. The particular provision of the Virginia code cited in Jaffee is expressly limited to civil matters. See Jaffe, 518 U.S. at 11 n.12 (citing VA. CODE ANN. § 8.01-400.2).

[31] The Sixth and Ninth Circuits also focus on the fact that it does not benefit the mentally ill to incarcerate them, and, implicitly, that it is not particularly blameworthy where the mentally ill make threatening remarks during therapy, even if the threats violate the law. This is a policy question for Congress, not the courts, because "such tender concern for criminal evidence is [not] required by the common law, or by reason and experience, when the patient has been put on notice." Hayes, 227 F.3d at 588 (Boggs, J., dissenting).

III.

Because Auster's non-confidential statement cannot, as a matter of law, be privileged, we need not address whether the district court improperly suppressed evidence sua sponte, erroneously placed the burden of disproving the privilege on the government, or abused its discretion in failing to hold an evidentiary hearing. We also need not decide whether there is a dangerous-patient or crime-fraud exception to the psychotherapist-patient privilege.

For the foregoing reasons, the order of suppression is REVERSED, and this matter is REMANDED for further proceedings.