# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1556

_____

United States of America,      *
          *
        Appellee,     *
          *   Appeal from the United States
    v.              *   District Court for the
          *   Western District of Missouri.
Hessam Ghane, also known as     *
Sam Ghane,         *
          *
        Appellant.     *

_____

Submitted: September 22, 2011
Filed:  March 9, 2012

_____

Before LOKEN, BEAM, and MURPHY, Circuit Judges.

_____

BEAM, Circuit Judge.

A jury convicted Hessam Ghane of stockpiling, retaining, and possessing a chemical weapon–potassium cyanide–in violation of 18 U.S.C. §§ 229(a)(1) and 229A(a)(1).  Ghane's conviction, obtained in December 2010, followed a previous trial in September 2010 for the same offense, resulting in a hung jury and mistrial.

Ghane appeals from his conviction and sentence, specifically challenging the district court's[1] denial of his pre-trial motion to dismiss and motion in limine. We affirm.

## I.    BACKGROUND

Dr. Hessam Ghane had a documented history of significant mental illness and he often sought the help of physicians for his condition. On February 4, 2003, Ghane was again suicidal and called a crisis hotline. The hotline personnel notified the local police department and officers were dispatched to Ghane's apartment.

Distressed, Ghane asked the officers for help and stated that he wanted to speak with a doctor. The responding officer ultimately transported Ghane to Overland Park Regional Medical Center (OPRMC) at Ghane's request. Ghane checked himself into the OPRMC emergency room (ER), where Gleb Gluhovsky, a physician's assistant, conducted the routine intake examination. According to OPRMC protocol, a patient who presents himself to the ER is first evaluated in the ER, prior to his ultimate placement in the proper health unit. Because Ghane presented with depression and suicidal ideation, Gluhovsky used a particular intake form, called a "T sheet," created specifically to record such an interview.

During Gluhovsky's evaluation, Ghane stated that he was having suicidal thoughts. Gluhovsky asked Ghane whether he had a "plan and means" to commit suicide and Ghane responded that if he were to commit suicide, he would use cyanide, which he had access to at his apartment. Ghane also stated that he would not be

---

[1]The Honorable Kathryn H. Vratil and the Honorable Ortrie D. Smith, District Judges, United States District Court for the Western District of Missouri, each handling various matters in this action, adopting the Reports and Recommendations of Robert E. Larsen, Magistrate Judge, United States District Court for the Western District of Missouri.

-2-

willing to give up the cyanide because "he might want to use it later."  During Ghane's interview with Gluhovsky, Ghane did not expressly threaten any other person. Following this interview, Gluhovsky obtained permission from the hospital's risk management to contact the police, due to the potential for public harm.

After Gluhovsky notified the police, a Detective Seever arrived at the hospital, interviewed Ghane, and obtained Ghane's written permission to search his apartment.[2] On February 5, 2003, officers conducted the search of Ghane's apartment and seized potassium cyanide.[3]

Once admitted to the psychiatric ward, Dr. Howard Houghton, a clinical psychiatrist, treated Ghane.  Dr. Houghton had treated Ghane periodically, but not exclusively, for many years.  On February 5, 2003, when Dr. Houghton saw Ghane for the first time following admission, Dr. Houghton performed a routine clinical examination for purposes of admission.  At that time, Ghane not only discussed his suicidal thoughts, but also stated that he had thoughts of harming others affiliated with the Corps of Engineers and that he had access to chemicals.  Ghane did not name specific individuals, however.  Dr. Houghton especially noted that on this occasion,

---

[2]Prior to trial, Ghane challenged the voluntariness of this consent by way of a motion to suppress.  The district court denied the motion and Ghane does not brief this issue on appeal.  See Bechtold v. City of Rosemount, 104 F.3d 1062, 1068 (8th Cir. 1997) ("Generally, we will consider an issue not raised or briefed in this court waived.").

[3]Approximately 177 grams of 75% pure potassium cyanide was seized from Ghane's apartment which, according to chemists that testified at trial, could kill 450 people in its solid form and constituted 900 lethal doses as a gas if reduced to hydrogen cyanide.  Roughly 200 milligrams of potassium presents a fatal dose for a human of average size, likened to about one fifth of a packet of sweetener such as Sweet 'N Low.

Ghane seemed "markedly different," unusually paranoid, and that Dr. Houghton was surprised by Ghane's hostility and irritability.

Because of Ghane's threats toward unnamed government officials and Dr. Houghton's concern over the elevated intensity of Ghane's emotions, Dr. Houghton sought advice from the hospital's risk management regarding whether and how to report this information to law enforcement. OPRMC's risk management advised Dr. Houghton to obtain Ghane's consent to allow Dr. Houghton to inform law enforcement. Dr. Houghton obtained Ghane's oral and written consent to contact the appropriate legal authorities after explaining to Ghane that the police needed to be made aware of the threats. Dr. Houghton did not explain to Ghane at the time that, as a result of Ghane's consent, Dr. Houghton may someday be called to testify against Ghane, that his testimony may result in a felony conviction, or that his testimony could result in jail time. Dr. Houghton then talked to an FBI agent regarding Ghane's threats and demeanor. Charges ensued and after many years of litigating Ghane's competence to stand trial, a jury returned the conviction we have before us today. Ghane appeals.

## II.    DISCUSSION

### A.    Vagueness and Overbreadth Challenge

Ghane asserts that the chemical weapon statute under which he was convicted is unconstitutionally vague in violation of his Fifth Amendment right to due process. "The void-for-vagueness doctrine protects persons by providing 'fair notice' of a statute's applicability and by preventing 'arbitrary and discriminatory prosecutions' of a statute's enforcement." United States v. Mabie, 663 F.3d 322, 333 (8th Cir. 2011) (quoting Skilling v. United States, 130 S. Ct. 2896, 2933 (2010)). "The vagueness doctrine recognizes that '[a] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily

-4-

guess at its meaning and differ as to its application, violates the first essential of due process of law.'" United States v. Birbragher, 603 F.3d 478, 484 (8th Cir. 2010) (alteration in original) (quoting United States v. Washam, 312 F.3d 926, 929 (8th Cir. 2002)). "'Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'" Washam, 312 F.3d at 929 (quoting United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32-33 (1963)). This court reviews de novo a district court's determination whether a penal statute is void for vagueness under the Fifth Amendment. Birbragher, 603 F.3d at 484.

The government charged Ghane with "knowingly stockpil[ing], retain[ing], and possess[ing], a chemical weapon, that is, potassium cyanide, which is a toxic chemical not intended by the defendant to be used for a peaceful purpose" as that term is defined in 18 U.S.C. § 229F(7)(A). As contemplated by the statute, "[c]hemical weapon" means "[a] toxic chemical and its precursors, except where intended for a *purpose not prohibited under this chapter*." 18 U.S.C. § 229F(1)(A) (emphasis added). "Toxic chemical" is defined by the statute as "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals." Id. at § 229F(8)(A). And, as relevant here, "[p]urposes not prohibited by this chapter" encompasses "peaceful purposes," which the statute defines as "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity." Id. at § 229F(7)(A).

Ghane first argues that the terms "chemical weapon," "toxic chemical," and "peaceful purpose" are all defined in section 229F(1)(A), 7(A), and (8)(A), in terms so imprecise that they (1) fail to provide citizens with fair notice of prohibited conduct, and (2) encourage arbitrary and discriminatory enforcement by government officials. Additionally, Ghane claims that the statutory definition of the term "toxic

chemical" is so broad that it could include prescription drugs, household products with potentially harmful side effects, and even nicotine and alcohol products.

Vagueness challenges like the one here, that "do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." Washam, 312 F.3d at 929. A two-pronged analysis is conducted in determining whether a statute is unconstitutionally vague: (1) the statute must define the offense with sufficient definiteness to provide fair warning or adequate notice as to what conduct is prohibited, and (2) it must also define the offense in a manner that does not encourage arbitrary and discriminatory enforcement. Id. As to overbreadth, a statute is considered overbroad if it prohibits constitutionally protected conduct in addition to the conduct the statute seeks to proscribe. Grayned v. City of Rockford, 408 U.S. 104, 114 (1972).

The district court rejected Ghane's argument that the statute is unconstitutionally vague and overbroad. The court recognized that while this statute could have been more artfully drafted, any alleged vagueness did not make the definitions meaningless. It determined that section 229F(7)(A) conveys sufficient warning regarding the activities in which an individual may or may not engage and that common understanding dictates that "peaceful purposes" are those that are not intended to cause harm. Too, the district court held that the statute modifies the definition of toxic chemicals by prohibiting only chemicals that are intended for a prohibited purpose and are consistent in type and quantity with such purpose, which sufficiently narrows the category of possession for which an individual can face criminal penalties.

While our review is de novo, we agree with the district court. We begin, as we are proscribed, with the presumptive validity of the statute. Arguments such as those made by Ghane in this action often "swim[] against . . . case law's current, which requires [courts], if we can, to construe, not condemn, Congress' enactments."

<u>Skilling</u>, 130 S. Ct. at 2928. While the terms highlighted by Ghane in this statute are certainly broad, we conclude they are neither unconstitutionally vague as applied to Ghane's actions nor overbroad in their relation to constitutionally protected behavior.

Likewise, the plain language of the statute gives adequate notice. We do not doubt the government and the public can discern purposes that are peaceful and those that are not. A person of ordinary intelligence could reasonably understand that stealing and possessing potassium cyanide (a highly dangerous and regulated substance) to effect a possible suicide might result in criminal culpability.[4]

In support of his vagueness argument, Ghane points to the jury's confusion at both of his trials regarding whether suicide is considered a "peaceful purpose" under the statute. It is true that at each trial the jury submitted questions[5] to the judge

_____

[4]Indeed, it is at least plausible that Ghane had actual notice that his procurement of the potassium cyanide by illegal measures and his possession of the same were illegal actions. This circuit acknowledges that an "actual notice" argument has some appeal. <u>Washam</u>, 312 F.3d at 930. In <u>Washam</u>, we cited with favor the Tenth Circuit's opinion in <u>United States v. Saffo</u>, 227 F.3d 1260, 1270 (10th Cir. 2000), wherein the defendant challenged a statute as unconstitutionally vague. We noted that in <u>Saffo</u>, "[t]he court held that the defendant could not sustain the challenge because she concealed her activities and lied to DEA agents, which showed that she had actual knowledge of the illegality of her actions." <u>Washam</u>, 312 F.3d at 930. Similarly, the evidence in the present case shows that Ghane obtained the potassium cyanide through illegal measures and on at least one occasion, lied to law enforcement regarding his possession of the cyanide, which could lead to the conclusion that Ghane knew his actions were illegal. And, given that Ghane carried a Bachelor's Degree in Chemistry, a Masters of Science in Industrial Organic Chemistry, and a Ph.D. in Analytical Chemistry, he was fully aware of the dangers presented to himself and others by his possession of the substance.

[5]However, Ghane does not advance an argument regarding error as to the jury instructions or that one or all of the questions should have been addressed by the district court as a matter of law. His only argument on appeal is that the statute itself

-7-

during deliberations indicating confusion, for example, as to what constituted "other activity," or whether, according to law, suicide could be considered a "peaceful purpose" under the statute.[6]  In each instance the court, although it struggled with how much information to provide the jury, left the determination to the jury, providing limited statutory definitions in response to questions.  While the first jury hung, the second arrived at a conviction.

Even though the issue of whether use of a chemical weapon for suicide is a purpose exempted by the statute seems to make this a close case, the existence of a close case in the application of a statute does not render it unconstitutionally vague. United States v. Williams, 553 U.S. 285, 306 (2008).  "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."  Id.  Here, in its definition of "peaceful purposes," the statute provides a narrowing context,[7] providing that "peaceful purposes" is "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity."  18 U.S.C. § 299F(7)(A).  Given this context, any reasonable jury is equipped to determine whether a particular set of facts suffices as an exempted use of a chemical weapon or not.  Specifically here, the jury looked at the discrete facts of committing suicide in this particular manner in light of the context set out by the statute.  That this might be a close call for the jury does not

is unconstitutionally vague and overbroad, as evidenced by the juries' confusion.

[6]Ghane never intended to conduct any sort of medical or industrial experiments with this potassium cyanide.  He maintained that he stole it to use just in case he wanted to commit suicide.

[7]Without this narrowing definition, we acknowledge it is possible the term is too subjective.  See Williams, 553 U.S. at 306 (reiterating that the Court has struck down statutes that tie criminal culpability to wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings).

mean the statute provides insufficient notice or warning as to what conduct is prohibited.

Ghane also points out that the Chemical Weapons Convention, the basis on which the statute was drafted, was not drafted using the model penal code as nearly all criminal statutes are, but rather was designed to act as a treaty among participating sovereign nations that undertook the task to eradicate the existence and future use and development of chemical weapons in warfare. Accordingly, argues Ghane, the drafters purposefully defined the three terms he highlights as broadly as possible so that nations could eradicate any and all chemical weapons, including ones they might not have been able to contemplate at the time. He claims that because of this, the government can hand pick only certain instances of contemplated suicide, for example, that it deems appropriate to label "use of a chemical weapon," thus resulting in discriminatory or arbitrary prosecutions, with no fair warning of prohibited conduct. However, on these facts, we find this argument unpersuasive. Our task is to look at the resulting statute drafted and determine whether it provides adequate notice of prohibited conduct and whether it encourages arbitrary and discriminatory enforcement, neither of which poses a problem in this case.

As to Ghane's claim that this statute is overbroad, even though various toxic chemicals might be contemplated by the statute, the statute sufficiently narrows the category of possession for which an individual can face criminal penalties by prohibiting only chemicals that are intended for a prohibited purpose and are consistent in type and quantity with such purpose. Accordingly, the statute does not criminalize protected activities outside the permissible bounds of congressional regulation and is therefore not unconstitutionally overbroad.

**B. Motion in Limine/Psychotherapist-Patient Privilege**

Ghane next argues that the district court erred in admitting the testimony of Gluhovsky, the physician's assistant who interviewed and examined Ghane in the ER; and Dr. Houghton, Ghane's treating psychiatrist. Prior to trial, the court denied Ghane's motion in limine which sought to exclude each man's testimony at trial under an application of the psychotherapist-patient privilege.

In the normal course, "[w]e review the district court's admission of testimony for an abuse of discretion." United States v. Bad Wound, 203 F.3d 1072, 1075 (8th Cir. 2000). However, because this case encounters the delineation of a federal testimonial privilege, which includes the decision, or not, to adopt a "dangerous patient" exception to the psychotherapist-patient privilege (a matter of first impression in this circuit), our review of the district court's analysis is de novo. "[T]he scope [or contours] of a privilege and the decision whether to establish a new privilege[, or to adopt an exception thereto,] are mixed questions of fact [(i.e, the applicability of a privilege)] and law [(i.e., the scope of a privilege)] which we review de novo." Carman v. McDonnell Douglas Corp., 114 F.3d 790, 793 n.2 (8th Cir. 1997); see also, United States v. Hayes, 227 F.3d 578, 581 (6th Cir. 2000) ("[W]e review de novo the district court's analysis of the contours of the psychotherapist/patient privilege.").

**1. Privilege Standard**

All evidentiary privileges asserted in federal court are governed, in the first instance, by Federal Rule of Evidence 501.[8] Federal privilege law, as conceived by

---

[8]Rule 501 provides in part:

Except as otherwise required by the Constitution of the United States or

Rule 501, is determined by "the principles of common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. R. Evid. 501. "The beginning of any analysis under Rule 501 is the principle that 'the public has a right to every man's evidence.'" Carman, 114 F.3d at 793 (quoting Hardwicke, L.C.J., quoted in 12 Cobbett's Parliamentary History, 675, 693 (1742)). Thus, in the development of testimonial privileges, courts "start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." Jaffee v. Redmond, 518 U.S. 1, 9 (1996) (quotations omitted). Accordingly, "these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." United States v. Nixon, 418 U.S. 683, 710 (1974).

The Supreme Court has recognized one such exception from "every man's evidence," the psychotherapist-patient privilege. In Jaffee, the Court held that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501." Jaffee, 518 U.S. at 15. As relevant here, a testimonial "privilege protecting confidential communications between a psychotherapist and her patient 'promotes sufficiently important interests to outweigh the need for probative evidence.'" Id. at 9-10 (quoting Trammel v. United States, 445 U.S. 40, 51 (1980)). That is, discussions in the course of therapy likely facilitate an atmosphere of confidence and trust conducive to meaningful treatment. Id. at 10.

---

provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Fed. R. Evid. 501.

> Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.

Id. Protecting these confidential communications from compelled disclosure at trial further serves the public as well "by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem." Id. at 11. "The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance." Id.

In Jaffee, the Supreme Court extended the psychotherapist-patient privilege to licensed social workers in addition to licensed psychiatrists and psychologists for the same reasons noted above. Id. at 15. The Court reasoned that licensed social workers provide a significant amount of mental health treatment and their clients often include individuals who may not otherwise be able to afford the assistance of a psychiatrist or psychologist. Accordingly, the Court held counseling sessions with a social worker serve the same public goals and thus conversations and notes taken during counseling sessions are protected from compelled disclosure under Rule 501. Id. at 16, 18. The Court rejected a "balancing component . . . [m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure." Id. at 17.

Very basically, in this case the district court held that the statements Ghane made to Gluhovsky during the ER intake interview and examination were not protected by the privilege because Gluhovsky was not a licensed psychotherapist and

Gluhovsky did not participate in the diagnosis and treatment of Ghane under the direction of Dr. Houghton. The court further held that even though Ghane's statements to Dr. Houghton fell squarely within the psychotherapist-patient privilege, they were nonetheless admissible under a "dangerous patient" exception. And, finally, the district court held that even if this circuit declined to acknowledge the "dangerous patient" exception to the privilege, Ghane knowingly and voluntarily waived the psychotherapist-patient privilege with a full understanding of the attendant circumstances. We address each of the district court's holdings in turn.

## 2. Physician's Assistant Gluhovsky

During Ghane's ER intake interview and examination with Gluhovsky, Ghane told Gluhovsky that he felt suicidal. Upon further questioning from Gluhovsky regarding Ghane's plans and means to act on these suicidal thoughts (a routine question if the subject arises during such an interview) Ghane informed Gluhovsky that he had cyanide in his apartment, which Ghane intended to use to commit suicide should Ghane eventually decide to do so. Ghane further indicated that he would not be willing to voluntarily give up this cyanide to anyone because he might want to use it later. Ghane claims that these statements fall within the psychotherapist-patient privilege and thus Gluhovsky should not have been allowed to testify at Ghane's criminal trial.

Specifically as to Gluhovsky, Ghane claims that the district court construed the privilege too narrowly. For example, he claims that refusing to apply the privilege because Gluhovsky conducted the intake interview with Ghane according to standard hospital procedures and did not, in fact, ever consult with Dr. Houghton or any other psychiatrist, fails to see the forest from the trees. Ghane argues that Gluhovsky was part and parcel of Ghane's psychiatric treatment and was a necessary component of Ghane's psychiatric care at OPRMC. He further claims that the court erred as a matter of law by construing the scope of the privilege so narrowly. Referencing with

-13-

authority the 1972 rules proposed by the Judicial Conference Advisory Committee, which recommended that Congress recognize a psychotherapist-patient privilege as part of the Rules of Evidence, Ghane argues that the psychotherapist-patient privilege extends not only to direct communications with psychotherapists, but also to any communications made to third parties who are "reasonably necessary for the transmission of the communication" to the psychotherapist, and to communications made to "those present to further the interest of the patient in the consultation, examination, or interview."  56 F.R.D. 183, 240-44 (1972) (hereinafter "Supreme Court Standard 504").  Here, Ghane claims, Gluhovsky was just the sort of person contemplated by the Supreme Court Standard.

We acknowledge that the Supreme Court Standard 504 is "a useful starting place" for an examination of this privilege, as the Supreme Court, and this court, too, has looked to these proposed standards to inform the definition of the federal common law of privileges, despite the failure of Congress to enact such a detailed article on privileges.[9]  In re Bieter Co., 16 F.3d 929, 935 (8th Cir. 1994); see also Jaffee, 518 U.S. at 10-11.  As recommended by the Supreme Court in 1972, the Supreme Court Standard 504 provided that:

> A communication is "confidential" if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or

----

[9]The more open-ended Federal Rule of Evidence 501 was substituted by Congress for the specific rules of privilege submitted by the Judicial Conference Advisory Committee on Rules of Evidence and approved by the Supreme Court.  56 F.R.D. 183, 230-61 (1972); Jaffee, 518 U.S. at 15 (noting that in rejecting the Supreme Court standard 504, the Senate Judiciary Committee explicitly stated that its action "'should not be understood as disapproving any recognition of a psychiatrist-patient . . . privileg[e] contained in the [proposed] rules.'") (alterations in original) (quoting S. Rep. No. 93-1277, at 13).

persons who are participating in the diagnosis and treatment under the direction of the psychotherapist, including members of the patient's family.

Supreme Court Standard 504(a)(3).

Despite the definition set forth in Supreme Court Standard 504, however, Ghane's statements to Gluhovsky are not subject to the privilege. Gluhovsky was not a licensed psychotherapist in the course of diagnosis or treatment despite Ghane's arguments to the contrary. The psychotherapist-patient privilege contemplates treatment. It does not encompass "care" provided by an ER physician's assistant whose job is to assess incoming patients and conduct intake interviews and evaluations. Ghane sought admission, not treatment, from Gluhovsky.

In Jaffee, the Court contrasts treatment by a physician for physical ailments that can be done on the basis of physical exams and diagnostic tests, with effective psychotherapy, which depends upon an atmosphere of trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Jaffee, 518 U.S. at 10. In its discussion of the contours of the psychotherapist-patient privilege, the Court only contemplated information gleaned during actual psychotherapy sessions conducted, obviously, by a licensed therapist. Id. at 11-12. The Court even made a point to extend the privilege to licensed social workers as well as licensed psychiatrists, all of whom provide actual mental health treatment. Id. at 15-16. Gluhovsky, on the other hand, in no way provided mental health treatment to Ghane, but merely completed an intake form as part of the hospital's protocol for all incoming patients, wherein future placement is determined for treatment. These communications are not subject to the privilege under Jaffee.

-15-

In its general definition of the privilege, the Supreme Court Standard further provides:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purpose of diagnosis or treatment of his mental or emotional condition, including drug addiction, among himself, his psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.

Supreme Court Standard 504(b). Adding texture to the analysis, Supreme Court Standard 504(b) thus also highlights that the patient's purpose in communicating with his psychotherapist (or other such licensed therapist) factors into our analysis. Noted above, Ghane spoke to Gluhovsky for purposes of hospital admission, not treatment. Gluhovsky was clear in his testimony that he did not provide any therapy, diagnosis or treatment to Ghane during their brief encounter.

Applying Jaffee, the Ninth Circuit articulates the burden placed on those wishing to invoke the benefit of the privilege, requiring a showing that "1) [the individual on the receiving end of the communications at issue] is a licensed psychotherapist, 2) [the defendant's] communications . . . were confidential, and 3) the communications were made during the course of diagnosis or treatment." United States v. Romo, 413 F.3d 1044, 1047 (9th Cir. 2005). In Romo, even though an inmate's confession that he had written a threatening letter to the President was made to a licensed professional counselor who had previously provided mental health treatment during voluntary counseling sessions with the inmate, the court held that the psychotherapist-patient privilege did not apply to the counselor's later testimony at trial because at the time the defendant made the confession, the private meeting between the two did not involve therapy, diagnosis or treatment. Id. at 1048. So, depending upon the circumstances, it is cognizable that even certain communications to one's own licensed therapist are not covered by the privilege.

-16-

Claiming that Gluhovsky was somehow integral or necessary to Ghane's psychiatric treatment stretches the limits of the privilege. Gluhovsky certainly facilitated Ghane's placement as a psychiatric patient, but that is the extent of Gluhovsky's involvement. Gluhovsky did not work for the psychiatric unit at the hospital, but rather answered to the demands of his own supervisor, the attending ER physician. Ghane argues that because the information collected by Gluhovsky was transmitted to Dr. Houghton and Gluhovsky knew that all of the information he collected would be employed by a psychiatrist in diagnosing and treating Ghane, Gluhovsky was reasonably necessary for the transmission of the communication, and thus all statements Ghane made to Gluhovsky during the ER intake interview are covered by the privilege. Granted, the information recorded by Gluhovsky certainly became part of Ghane's admitting chart, but there is no evidence that this information was used in Ghane's later treatment or diagnosis, nor is it likely that it would be used in a way contemplated by the Supreme Court Standard. Dr. Houghton had no contact with Gluhovsky throughout these incidents, and, in fact, Dr. Houghton testified that at the time he first spoke to Ghane on February 5, Dr. Houghton conducted his own routine psychiatric admission wherein Dr. Houghton met with Ghane, interviewed Ghane and obtained the appropriate history. Gluhovsky in no way treated Ghane, did not conduct psychotherapy or counseling, nor did he consult with Dr. Houghton or any other psychiatrist during the relevant time period. Passing intake information along in a chart does not suffice as "treatment" sufficient to cloak these conversations with the privilege.

Despite Ghane's interpretation of the language contained in Supreme Court Standard 504 defining confidential communication, extending the privilege to Gluhovsky on these facts defies Jaffee, which clearly limits the application to those licensed individuals actually involved in mental health treatment. Jaffee, 518 U.S. at 15-18. A contrary conclusion on these facts would not comport with binding precedent. Therefore, as to the statements made by Ghane to Gluhovsky, the district

court did not err by denying application of the psychotherapist-patient testimonial privilege.

### 3. Dr. Houghton

When Dr. Houghton met with Ghane on February 5, 2003, the day after Ghane's admission to OPRMC, Ghane threatened unnamed government employees in the Corps of Engineers and noted that he had "access to chemicals." Ghane made these statements to Dr. Houghton in a highly charged emotional state; Ghane's demeanor that day was different, more irritated and hostile, than it had been on all of Dr. Houghton's multiple, previous encounters with Ghane. As a result of this perceived threat, Dr. Houghton sought the advice from the hospital's risk management and ultimately obtained Ghane's consent to notify appropriate legal authorities of the threats.

Both parties astutely agree that the statements made by Ghane to Dr. Houghton fall directly within the psychotherapist-patient privilege previously discussed. Dr. Houghton was Ghane's treating psychiatrist and Ghane's statements were made to Dr. Houghton in the course of treatment. However, the district court applied, and Ghane now challenges, an exception to this privilege recognized by a discrete number of circuits; that is, the "dangerous patient" exception. Accordingly, Dr. Houghton testified at Ghane's criminal trial.

In Jaffee, the Court observed in a footnote: "[W]e do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist." Jaffee, 518 U.S. at 18 n.19. Arising from this dictum is a "dangerous patient" exception to the psychotherapist-patient privilege discussed, but often rejected, by circuit courts. United States v. Auster, 517 F.3d 312, 315-16 (5th Cir. 2008) (recognizing that an exception to the privilege exists and can be useful in a

-18-

criminal trial, but refusing to apply it on the facts of the case because the patient knew his communication to his therapist was not confidential); United States v. Chase, 340 F.3d 978, 992 (9th Cir. 2003) (en banc) (holding that even if a patient knows that a threat is not made in confidence, any statements made to the therapist are privileged in a federal trial); Hayes, 227 F.3d at 583-87 (analyzing and ultimately rejecting the dangerous patient exception to the federal psychotherapist-patient testimonial privilege); United States v. Glass, 133 F.3d 1356, 1360 (10th Cir. 1998) (restricting the application of the exception to situations where the threat was serious when it was uttered and its disclosure was the only means of averting harm).

Ghane argues that the "dangerous patient" exception has no place in federal criminal law, citing the reasoning of the Sixth and Ninth circuits, which have rejected its application. We agree with our sister circuits that have rejected this exception and decline to interpret the dictum in Jaffee as establishing a precedentially binding "dangerous patient" exception to the federal psychotherapist-patient testimonial privilege.

In Hayes, the Sixth Circuit adeptly analyzed the dangers associated with the adoption of such an exception. We adopt Hayes' reasoning. At the outset, we, too, reject the Tenth Circuit's application of the "dangerous patient" exception, which ties the standard of care exercised by a treating psychotherapist in complying with a state's "duty to protect" requirement, with the applicability of the psychotherapist-patient privilege in criminal proceedings. Glass, 133 F.3d at 1360 (determining that the alleged "exception" to the Jaffee privilege is applicable only where the threat was serious when made and disclosure is literally the only means of averting harm).

> We see only a marginal connection, if any at all, between a psychotherapist's action in notifying a third party (for his own safety) of a patient's threat to kill or injure him and a court's refusal to permit the therapist to testify about such threat (in the interest of protecting the psychotherapist/patient relationship) in a later prosecution of the patient

-19-

for making it[, or any other prosecution for a similarly related criminal charge].

Hayes, 227 F.3d at 583-84.  Advancing any connection between the standard of care exercised by a treating psychotherapist with an application of the "dangerous patient" exception is "unsound in theory and in practice."  Id. at 584.  "Such an inquiry would, at a minimum, be highly speculative and very likely lead to erratic results[,]" as the scope of this federal testimonial privilege would vary depending upon state determinations of what constitutes "reasonable" professional conduct in these circumstances.  Id.

Second, adopting a "dangerous patient" exception to the psychotherapist-patient privilege would necessarily have a deleterious effect on the "confidence and trust" the Supreme Court held is implicit in the confidential relationship between the therapist and a patient–an interest the Court also held serves public ends "by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem."  Jaffee, 518 U.S. at 10, 11; Hayes, 227 F.3d at 584-85.  The "dangerous patient" exception to the federal testimonial privilege is quite different from a therapist's "duty to protect," which is already in place.

> While early advice to the patient that, in the event of the disclosure of a serious threat of harm to an indentifiable victim, the therapist will have a duty to protect the intended victim, may have a marginal effect on a patient's candor in therapy sessions, an additional warning that the patient's statements may be used against him in a subsequent criminal prosecution would certainly chill and very likely terminate open dialogue.

Hayes, 227 F.3d at 584-85.

We likewise recognize, as did the Sixth Circuit in Hayes, that there *are* times when a therapist can testify at a hearing and it will not have the above-mentioned deleterious effect on the confidence the therapist shares with his patient. Id. Having a therapist testify at his patient's own involuntary commitment proceedings is a different matter altogether. Testimony such as this comports with the already-existent "duty to protect" the patient or identifiable third parties placed on therapists generally. And, once committed, the patient's mental health care continues, quite possibly with the very same mental health professional that recommended the involuntary commitment. Id. at 585. This furthers the public interest advanced and discussed by the Supreme Court in Jaffee. Jaffee, 518 U.S. at 11. The same cannot be said for testimony at a patient's later criminal trial, for example. "[A] psychotherapist's testimony used to prosecute and incarcerate a patient who came to him or her for professional help cannot be similarly justified." Hayes, 227 F.3d at 585. Once incarcerated as the result of a criminal prosecution, "the probability of the patient's mental health improving diminishes significantly and a stigma certainly attaches after the patient's sentence is served." Id.

> We hold, therefore, that the federal psychotherapist/patient privilege does not impede a psychotherapist's compliance with his professional and ethical duty to protect innocent third parties, a duty which may require, among other things, disclosure to third parties or testimony at an involuntary hospitalization proceeding. Conversely, compliance with the professional duty to protect does not imply a duty to testify against a patient in criminal proceedings or in civil proceedings other than directly related to the patient's involuntary hospitalization, and such testimony is privileged and inadmissible if a patient properly asserts the psychotherapist/patient privilege.

Id. at 586. Thus, we do not adopt the "dangerous patient" exception to the federal psychotherapist-patient testimonial privilege. As such, the court erred in applying such an exception and admitting Dr. Houghton's testimony at trial. This, however, was not reversible error, as discussed below.

-21-

### 4. Waiver

The government alternatively argues that because Ghane consented to Dr. Houghton notifying appropriate legal authorities of Ghane's alleged threats, Ghane waived any protection from the psychotherapist-patient privilege. While we agree with the proposition that the psychotherapist-patient privilege can be waived, Jaffee, 518 U.S. at 15 n.14, Ghane's "consent" was legally insufficient and there was no waiver here.

Here, after Dr. Houghton met with Ghane on February 5, Dr. Houghton contacted the hospital's risk management, seeking guidance on how to handle the threats expressed by Ghane, especially given Ghane's demeanor during his interaction with Dr. Houghton. Upon the advice of risk management, and before reporting Ghane's statements to the FBI, Dr. Houghton obtained Ghane's written and oral consent. In doing so, Dr. Houghton told Ghane that given the nature of the threats, Dr. Houghton felt legal authorities needed to be advised and that it would probably be the police. Dr. Houghton asked Ghane if that would be okay and Ghane said, "yes." Then, Ghane signed a consent form, indicating that information regarding Ghane's "hospitalization and conditions" could be released to "anyone." The word "anyone" was handwritten in a blank by Ghane.

We have already stressed the policy implications and distinct differences between advising a patient regarding the therapist's "duty to protect" and advising the patient of the possibility that the patient's statements may be used against him in a subsequent criminal prosecution. "It is one thing to inform a patient of the 'duty to protect;' [but] it is quite another to advise a patient that his 'trusted' confidant may one day assist in procuring his conviction and incarceration." Hayes, 227 F.3d at 586. The consent obtained in this case was insufficient. Although Dr. Houghton advised Ghane that legal authorities should be notified regarding Ghane's general threats, Dr.

-22-

Houghton did not, importantly, inform Ghane that should Ghane consent to such disclosure, Ghane's statements may be used against him in a subsequent criminal prosecution. "[I]t must be the law that, in order to secure a valid waiver of the protections of the psychotherapist/patient privilege from a patient, a psychotherapist must provide that patient with an explanation of the consequences of that waiver suited to the unique needs of that patient." Id. at 587. Accordingly, on these facts, Ghane cannot be said to have knowingly or voluntarily waived his rights to assert the psychotherapist-patient privilege here, which renders the government's waiver argument meritless. Moran v. Burbine, 475 U.S. 412, 421 (1986) (a knowing and intelligent waiver is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it).

### 5. Harmless Error

We have thus established that on these facts, as to Ghane's statements to Dr. Houghton, Ghane should have been afforded the protections of the psychotherapist-patient privilege without exception and Dr. Houghton should not have been allowed to testify. The government does not maintain that admission of Dr. Houghton's testimony was harmless error. Given this waiver, we are not obliged to reach the issue in our analysis. United States v. Causevic, 636 F.3d 998, 1004 (8th Cir. 2011); United States v. Montgomery, 100 F.3d 1404, 1407 (8th Cir. 1996) (holding that when harmless error is not raised in an appellate brief, the argument is waived unless the court exercises discretion to overlook the waiver). However, an appellate court has discretion to overlook the waiver in certain circumstances, including when we are certain, for example, that reversal would merely result in protracted, costly and futile proceedings in district court. Lufkins v. Leapley, 965 F.2d 1477, 1481 (8th Cir. 1992). Finding the latter true in this case, we find the district court's erroneous admission of this testimony harmless in the final analysis.

-23-

"This court . . . 'will not reverse a conviction if an error was harmless.'" <u>United States v. Aldridge</u>, 664 F.3d 705, 714 (8th Cir. 2011) (quoting <u>United States v. Henderson</u>, 613 F.3d 1177, 1183 (8th Cir. 2010)), <u>cert. denied</u>, 131 S. Ct. 2151 (2011). "An evidentiary error amounts to harmless error if, after viewing the entire record, the reviewing court determines that no substantial rights of the defendant were affected, and that the error had no, or only slight, influence on the verdict." <u>United States v. White Bull</u>, 646 F.3d 1082, 1093 (8th Cir. 2011) (quotation omitted). "In determining harmlessness, this court considers the effect of the erroneously-admitted evidence in the overall context of the government's case." <u>United States v. Worman</u>, 622 F.3d 969, 976 (8th Cir. 2010), <u>cert. denied</u>, 132 S. Ct. 369 (2011). This court has found harmless error where, "'the government introduced ample competent evidence from which the jury could conclude beyond a reasonable doubt that the defendant was guilty even without the evidence that should have been excluded.'" <u>Aldridge</u>, 664 F.3d at 714 (quoting <u>United States v. Falls</u>, 117 F.3d 1075, 1077 (8th Cir. 1997)).

After carefully reviewing the trial transcript, we are satisfied that the admission of Dr. Houghton's testimony was harmless. Dr. Houghton testified that Ghane had access to chemicals and that Ghane was a self-admitted threat to himself and others. But this was cumulative of other testimony to the same effect. Additionally, several witnesses, including Dr. Houghton, testified as to Ghane's admissions that he had suicidal thoughts, and the jury specifically asked whether suicide sufficed under the charged statute–an issue we previously determined the jury was fully capable of determining. Dr. Houghton's testimony added nothing to the jury's latter discussion. Dr. Houghton did uniquely testify that Ghane further honed his threats against the "government," albeit not by much, directing them generally to the Corps of Engineers; and Dr. Houghton also testified about his treatment of Ghane on prior visits as well as the day in question.

At trial, the burden was on the government to prove the charge contained in the indictment–that is, that Ghane "did knowingly stockpile, retain, and possess, a

chemical weapon, that is, potassium cyanide, which is a toxic chemical not intended by the defendant to be used for a peaceful purpose as that term is defined" by 18 U.S.C. § 229F(7)(A), all in violation of 18 U.S.C. § 229(a)(1) and 229A(a)(1).  Here, the government presented substantial evidence independent of Dr. Houghton that met its burden.

On appeal the parties do not spend much time, if any, discussing the admissions Ghane voluntarily[10] made to Detective Seever the night of February 4.  When Detective Seever and his partner arrived at the hospital, Gluhovsky informed them of Ghane's psychiatric issues, Ghane's threats, and the mention of potassium cyanide. During Detective Seever's interview with Ghane, although Ghane denied having cyanide in his apartment, Ghane indicated to Detective Seever that he had access to potassium cyanide.  During this interview, Ghane gave the officers consent to search his apartment, which resulted in the seizure of the potassium cyanide.  Thus, on the basis of Detective Seever's testimony alone, the jury could determine that the government established that Ghane possessed a substance that could be considered a chemical weapon under the charging statute, and that he had threatened himself and, possibly, others.

Layering Gluhovsky's testimony on top of Detective Seever's readily leads us to conclude that any error in admitting Dr. Houghton's testimony was harmless. Gluhovsky testified that Ghane checked himself in to the ER with suicidal thoughts and that he was in possession of potassium cyanide, which Ghane was unwilling to surrender when asked.  And, finally, Ghane himself testified that he stole the potassium cyanide, kept it in his apartment, and possessed it with the intention to

---

[10]As previously noted, in his pre-trial motion to suppress, Ghane challenged the voluntariness of the consent he gave to Detective Seever to search his apartment, which resulted in the seizure of the potassium cyanide from Ghane's residence.  The court held that Ghane's consent was knowing and voluntary.  Ghane does not challenge this ruling on appeal.

commit suicide if life became intolerable.[11]  Ghane also testified that he never intended to conduct any type of medical experiments with this potassium cyanide.

Given the weight of the admissible evidence, we hold that Dr. Houghton's testimony had only a slight effect, if any, on the jury's verdict.  The district court's evidentiary error was thus harmless.

## III.    CONCLUSION

We affirm.

LOKEN, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment.

Like the district court, I would follow the Seventh Circuit's decision in United States v. Wimberly, 60 F.3d 281, 285 & n.2 (7th Cir. 1995), and the dissenting opinion in United States v. Hayes, 227 F.3d 578, 587 (6th Cir. 2000) (Boggs, J., dissenting), and hold that Ghane waived his privilege to object to the testimony of Dr. Houghton.  For this reason, I would not reach the question whether there may be situations when footnote 19 of the Supreme Court's opinion in Jaffee mandates, or at least strongly supports, adoption of a "dangerous patient" exception to the psychotherapist-patient privilege in criminal proceedings.  Accordingly, I respectfully dissent from Part II.B.3 of the court's opinion.  In all other respects, I join the opinion and concur in the decision to affirm.

_____

[11]Again, the amount of potassium cyanide seized from Ghane's apartment *greatly* exceeded an amount necessary to accomplish suicide, as a lethal dose is conservatively estimated to be approximately 200 to 300 milligrams, or one fifth of a packet of Sweet 'N Low.  The pint-sized bottle of potassium cyanide recovered in this case was one-third to one-half full.