# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-1284

_____

United States of America

*Plaintiff - Appellee*

v.

Jack Frison, Sr.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 15, 2016
Filed: June 8, 2016

_____

Before LOKEN, GRUENDER, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

After a bench trial, Jack Frison, Sr., was convicted of conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371, aiding and abetting copyright infringement in violation of 17 U.S.C. § 506(a)(1)(A) and 18 U.S.C. § 2319(b)(1) and (2), and aiding and abetting the trafficking of counterfeit goods in

violation of 18 U.S.C. §§ 2320(a), (b)(1) and 18 U.S.C. § 2. The district court[1] sentenced Frison to two years' imprisonment on each count, to be served concurrently. Frison appeals, arguing that the statutes of conviction are unconstitutionally vague as applied to him. We have jurisdiction pursuant to 28 U.S.C. § 1291, and finding no constitutional violation, we affirm.

## I. Background

Jack Frison, Sr., was the owner of the Frison Flea Market, which he opened in 1985. The flea market was a facility in which dozens of vendors sold their goods from rented booths within the premises. The market was typically open three days each week, and Frison was usually present at the flea market during its hours of operation. Frison's income was derived from charging vendors a rental fee for the booths, and by charging customers an entry fee of $1 each.

The booth fees for vendors varied. Vendors could rent booths by the day or by the month, with most vendors choosing to rent on a monthly basis. Monthly vendors usually paid several hundred dollars per month in fees to Frison, and were allowed to leave their inventory and merchandise at the flea market while it was closed.

Many of the vendors in Frison's flea market sold counterfeit goods, including clothing, footwear, purses, and accessories. The price, quality, and packaging of the goods strongly indicated that they were counterfeit, yet they bore trademarks and service marks identical to and substantially indistinguishable from marks that were in use and registered on the principal register of the United States Patent and Trademark Office. The vendors also sold counterfeit copies of movies and music that were protected by copyright. None of the owners of the trademarks, service marks,

_____

[1]The Honorable Rodney W. Sippel, Chief Judge, United States District Court for the Eastern District of Missouri.

-2-

or copyrights had granted Frison or the flea market vendors permission to use their marks or copyrights or to sell counterfeit goods.

Frison routinely met with the vendors he rented to, walking around the premises of his flea market and engaging in personal interactions with them. Frison also received warnings that he was responsible for any unlawful activity on his property. In 2003, for instance, a police officer told Frison that he needed to shut down any vendor selling counterfeit goods, because he was responsible for everything in his flea market. Frison disagreed, saying he owned the market, not the booths.

In June 2003, the Recording Industry Association of America (RIAA) notified Frison that numerous vendors at his flea market were selling illegal bootleg copies of music. Later that same year, the St. Louis County Police Department conducted an undercover investigation into the sale of bootleg CDs. The investigation culminated with a raid of the flea market in December 2003, during which investigators arrested several vendors and seized thousands of illegal copies of movies and music. Frison was interviewed by investigators and acknowledged that he had received a prior notice from the RIAA regarding illegal sales at his flea market, but stated that he had torn up the notice. The raid apparently did not stop the illegal sales and the RIAA provided another notice to Frison in July 2004.

In October 2007, Department of Homeland Security and Immigration and Customs Enforcement agents executed search warrants directed at three of the large vendors within the Frison Flea Market selling counterfeit clothing and other items. Afterwards, vendors continued to engage in the open sale of counterfeit goods at the flea market.

In November 2008, Coach, Inc. and Coach Services (Coach) served the Frison Flea Market with a cease and desist notice regarding the sale of counterfeit Coach goods. In December 2010, Coach sued Frison and his market for trademark

infringement. After the lawsuit, Frison directed vendors to stop selling counterfeit Coach brand items. Frison began requiring vendors who had sold counterfeit Coach purses and products to pay him a $500 fine to help offset his legal expenses. A purse vendor testified that failure to pay the fine would likely result in getting expelled from the flea market. Frison continued to permit vendors to openly sell other counterfeit purses and items, including vendors who were known to be previously selling counterfeit Coach items.

On January 27, 2012, undercover agents again witnessed vendors selling counterfeit DVD copies of copyright-protected movies. The prices reflected their counterfeit nature. The agents saw movies advertised for $2 per movie, 3 movies for $5, and 6 movies for $10. An undercover agent bought 6 of the counterfeit movies for $10 from one of the vendors, choosing the titles from a display on a table. The vendor then retrieved the six DVDs from a plastic box, which he placed in covers and gave to the undercover agent.

On February 23, 2012, Frison received a written complaint from the Better Business Bureau (BBB) advising him that a consumer had filed a complaint that the Frison Flea Market continually allowed the sale of a variety of counterfeit goods. Frison wrote a letter to the BBB in response, stating that no one had been arrested or charged in connection with the sale of counterfeit goods at his market.

On February 24, 2012, authorities conducted another undercover operation at the Frison Flea Market. Using electronic and video surveillance, investigators monitored Frison while he gave a tour of the flea market to an undercover agent posing as a potential vendor looking for a booth from which to sell counterfeit iPhones bearing a counterfeit Apple trademark. Frison assured the undercover agent that people would buy the fake phones and explained his booth rental policies and terms. When the agent asked Frison about booth locations near the front of the market, Frison told her that vendors near the front had made him millions of dollars.

-4-

The agent gave Frison a sample counterfeit iPhone, which he kept. Frison did not tell the agent at any time during the meeting or tour that he did not allow the sale of counterfeit goods within the flea market.

On May 13, 2012, the undercover agent met with Frison again. This meeting was also recorded by electronic and video surveillance. The undercover agent rented a booth from Frison in order to sell fake iPhones. In the midst of a conversation on the availability of booth space in the market, Frison stated that he preferred his vendors to use the term "lookalike," rather than referring to counterfeit iPhones as "fake." Frison did, however, require the undercover agent to sign a form indicating that she would not commit any trademark "enfranchement." The undercover agent eventually set up her booth and sold several counterfeit iPhones in controlled sales to undercover officers and investigators posing as customers. Frison did not ask for a cut of the agent's proceeds, but received $18 for the daily booth rental.

On June 22, 2012, a federal search warrant targeting the seizure of trademark-protected items was executed at the Frison Flea Market. Authorities seized approximately 10,000 counterfeit purses, approximately 60,000 counterfeit/bootleg movie DVDs, and approximately 50,000 illegally-copied music CDs. A total of 164,669 counterfeit items were seized. The estimated manufacturer's retail prices of the counterfeit merchandise suggested that if the goods had been authentic, they would have been worth more than 20 million dollars. A DVD disk burner was also seized. The MPAA and RIAA inspected samples of the seized DVDs and CDs and concluded they were not authentic. The counterfeit iPhone that the undercover agent had given Frison a few months prior was found in his business office.

Agents also seized records, notes, and correspondence from Frison's office. Many of the records revealed the extent of Frison's control over the market. For instance, in a "dealer newsletter" document dated February 5, 2005, Frison addressed "Price wars," writing "One, there will not be anyone in here underselling or

undercutting prices on the merchandise. I have had this problem many years ago. One time it was with tapes, earrings, jewelry, and now the clothing. We will set one price, and everyone will sell." In a topic list for a vendor meeting, Frison wrote to himself, "I must fix prices." Frison's records also revealed that, as far back as 1997, he was aware of the illegality of various items being sold in his flea market, indicating in his business notes that vendors were selling illegal goods and at one point giving them notice that they had three weeks to sell their illegal merchandise.

In another notice to dealers, dated December 2004, Frison wrote "I am the sole owner of this business and property as well as the corporation, president, and CEO. I am responsible for everything at this business at all times. You will cooperate or leave. When I state what I can or cannot be – when I state what can or cannot be done, I mean it. So don't play."

In a June 22, 2012, interview with investigators, Frison eventually acknowledged that he knew vendors were probably selling illegal copies of DVDs and music. On June 20, 2013, Frison was arrested on the instant federal indictment.

At trial, the government argued that Frison was aware of, had benefited from, and actively refrained from shutting down the sale of counterfeit goods at the Frison Flea Market. Frison had made hundreds of thousands of dollars annually, both from booth rental fees and door admission fees. In 2009, for example, Frison made approximately $502,104 from booth rental fees and $229,924 from door admission fees. In 2010, he made approximately $527,824 from booth rental fees and approximately $265,548 from door admission fees. In addition, Frison earned money by fining vendors who sold counterfeit goods. One of Frison's memos indicated that vendors selling counterfeit goods were "fined $150. Pay and stay." The government also argued that the fines were not meant to dissuade the sale of counterfeit goods, but rather operated as a "street tax" or enhanced rental fee Frison charged in exchange for allowing the sale of counterfeit goods to continue. One vendor testified Frison

had told the vendors "I'm protecting you guys. Do you see the police walking around here and you're not being arrested? That's why you have to pay this fine, because [I] take[] care of the police."

## II. Discussion

Frison alleges that 18 U.S.C. §§ 2, 371, 2319, and 2320, and 17 U.S.C. § 506[2] are unconstitutionally vague as applied to him as an aider and abettor or co-conspirator. "The question of whether a statute is constitutional is a question of law and must be reviewed de novo." United States v. Prior, 107 F.3d 654, 658 (8th Cir. 1997) (quoting United States v. Wesley, 990 F.2d 360, 363 (8th Cir. 1993)).

Frison argues that the statutes under which he was charged and convicted are unconstitutional as applied to him because he did not have fair notice that his behavior was criminal; it was unclear what he should have done to avoid liability; and law enforcement enforced the statutes arbitrarily.

"A statute is void for vagueness if it: (1) 'fails to provide a person of ordinary intelligence fair notice of what is prohibited,' or (2) 'is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" United States v. Cook, 782 F.3d 983, 987 (8th Cir. 2015) (quoting Holder v. Humanitarian Law Project, 561 U.S. 1, 18 (2010)). "We consider whether a statute is vague as applied

---

[2]The statutes cover aiders and abettors as principals (18 U.S.C. § 2), conspiracy to commit an offense or to defraud the United States (18 U.S.C. § 371), criminal infringement of a copyright (18 U.S.C. § 2319), trafficking in counterfeit goods or services (18 U.S.C. § 2320), and criminal infringement of a copyright (17 U.S.C. § 506). Frison does not distinguish among the statutes or take issue with any language within a single statute, so we consider them together in analyzing his as-applied vagueness challenge. We address Frison's arguments and the statutes collectively in light of the overall conduct at the Frison Flea Market.

to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" Id. (quoting Holder, 561 U.S. at 18–19).

Frison complains that the statutes at issue failed to give him fair notice that his conduct was criminal. Cook, 782 F.3d at 988. Specifically, he claims he did not have notice that a passive landlord who is merely renting his property could be held responsible for the actions of his tenants – tenants who were, in this case, illegally selling counterfeit goods and improperly reproducing or distributing copyrighted works. But Frison was not simply a passive landlord. Instead, as the district court found, Frison was actively involved at his market, continually reminded his vendors that he was in charge, and even involved himself in regulating the prices of counterfeit goods. Frison's attempt to carve out a niche for the truly passive landlord is unavailing on the facts of this case.

Even if Frison had been a less active landlord, a person of ordinary intelligence would reasonably understand that intentionally selling counterfeit products at a flea market, or willfully infringing copyrighted works at the market for financial gain, could result in criminal liability, and that intentionally aiding and abetting such conduct could result in the same. See United States v. White, 882 F.2d 250, 252 (7th Cir. 1989) (citing Knutson v. Brewer, 619 F.2d 747, 750 (8th Cir. 1980)) (holding that in a Fifth Amendment challenge, "[p]rovided that conduct is of a sort widely known among the lay public to be criminal . . . a person is not entitled to clear notice that the conduct violates a *particular* criminal statute. It is enough that he knows that what he is about to do is probably or certainly criminal."). Frison makes no meaningful argument otherwise.

Moreover, the evidence shows Frison received actual notice that his conduct as the operator of the flea market was unlawful, a factor that is relevant to our analysis. See United States v. Ghane, 673 F.3d 771, 778 n.4 (8th Cir. 2012); United

States v. Washam, 312 F.3d 926, 930 (8th Cir. 2002) (holding that an argument of "actual notice" has some appeal and weakens a constitutional vagueness challenge (citing United States v. Saffo, 227 F.3d 1260, 1270 (10th Cir. 2000)).[3] Several events put Frison on notice that he was responsible for the illegal conduct at the flea market. In 2003, Officer Gary Nichols, Jr., "was directed by the police chief" to inform Frison "that he was responsible for all the contents inside" his flea market, and he needed to "shut . . . down or remove" any pirated items. When Frison "said that he just owned the building," not the booths, Officer Nichols "advised to him that he owns the building," and was "responsible for everything inside the building."

Frison was also given cease and desist letters from the RIAA. One letter specifically stated that "Manufacturing, selling, and/or offering for sale unauthorized phono records is illegal, and these actions must stop at once." It advised Frison to revoke the licenses of vendors to operate on his property if they were selling counterfeit goods. The RIAA also included "a copy of one of the civil cases in which a flea market owner was held liable for infringing activity taking place on his premises," and "press clips . . . relating to other flea markets that had been implicated in infringing activity." Frison told one RIAA official that he was "not responsible for what [vendors] sell in their individual booths," and when RIAA officials attempted to explain the cease and desist order, Frison "ripped the paper and threw it on the ground."

In further support of his vagueness challenge, Frison asserts that he was doing all he thought he needed to do to comply with the law, and therefore it was unclear to him how to avoid criminal liability. He notes the signs he had posted that told vendors not to sell counterfeit merchandise, and his rental agreement with vendors

---

[3]Saffo held that a defendant could not sustain her vagueness challenge where her behavior showed she had actual knowledge of the illegality of her actions. 227 F.3d at 1270.

that said "No illegal copyright 'enfranchment' [sic]." Frison also, at times, fined vendors for selling counterfeit products. However, the district court, as the trier of fact, was unconvinced by Frison's lip service attempts at compliance. Frison did not evict violators from the premises and he benefited from fining them, indicating both that he knew fake merchandise was being sold and that he chose not to shut down their activities. In fact, Frison told vendors that he was "protecting them."

Moreover, to find Frison guilty of aiding and abetting the trafficking of counterfeit goods, the district court necessarily found he acted intentionally, and in finding him guilty of aiding and abetting the criminal infringement of a copyright, that he acted willfully.[4] See 18 U.S.C. § 2320; 17 U.S.C. § 506; United States v. Roan Eagle, 867 F.2d 436, 445 (8th Cir. 1989) ("Aiding and abetting is not a separate crime but rather is linked to the underlying offense and shares the requisite intent of that offense."). Likewise, the conspiracy conviction required a similar finding. See United States v. Bertling, 611 F.3d 477, 480 (8th Cir. 2010) ("[I]n order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself" (quoting United States v. Feola, 420 U.S. 671, 686 (1975))). "Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." United States v. Mabie, 663 F.3d 322, 333 (8th Cir. 2011) (quoting Washam, 312 F.3d at 929). The evidence showed that Frison both understood that his tenants were acting contrary to the law and actively helped to facilitate the unlawful conduct to his and his tenants' financial benefit.

---

[4]The government also points out that "scienter requirements alleviate vagueness concerns," and "narrow the scope of" the statutes' "prohibition[s] and limit prosecutorial discretion." Gonzales v. Carhart, 550 U.S. 124, 149–50 (2007).

-10-

Frison points out that different witnesses gave differing testimony about how he should have acted to escape liability. But Frison points to no evidence that he made any meaningful attempt to comply with the law. In fact, the evidence indicates that Frison acted to the contrary. Investigators found records in Frison's office concerning the "sale of illegal merchandise" with notes to "sell under the table." Moreover, Frison advised an undercover agent that she should use the term "lookalike" rather than "fake" when selling her product, and never once told her that he would not allow her to sell obviously counterfeit goods. There may have been multiple ways by which Frison could have operated his flea market lawfully, but that does not render the relevant statutes unconstitutionally vague as applied to him due to lack of notice.

Finally, we address Frison's argument that law enforcement lacked explicit standards for enforcing the statutes at issue. While "Congress must provide minimal requirements to guide law enforcement [so as not to] permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections," Frison has not established there was arbitrary enforcement here. Cook, 782 F.3d at 990 (second alteration in original) (quoting United States v. Birbragher, 603 F.3d 478, 489 (8th Cir. 2010)). Frison does not argue that law enforcement applied these statutes to him and not to others, but rather points out that the government failed to charge him with criminal activity after every violation, alleging that the failure to do so indicates arbitrary enforcement. Due process prohibits us "from retroactively applying a new construction of a criminal statute where it was not previously clear the statute authorized that construction, but there is no bar where the statute, 'standing alone . . . made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" Cook, 782 F.3d at 990 (alteration in original) (quoting United States v. Lanier, 520 U.S. 259, 266–67 (1997)). Frison presents no reason to believe the statutes at issue did not clearly apply to him, and he fails to consider that although his arrest did not occur sooner, he was given numerous warnings over the years that his conduct violated the law.

-11-

## III. Conclusion

We affirm the judgment of the district court.

_____